

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**01/10/2013**

| | | |
|---|---|---|
| In re: | § | |
| KARL C. STOMBERG, | § | **Case No.: 10-41603** |
| Debtor. | § | |
| | § | **Chapter 7** |

## MEMORANDUM OPINION ON ORDER REQUIRING CALVIN BRAUN TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE SANCTIONED FOR CONDUCT DESCRIBED HEREIN WITH RESPECT TO THE FILING OF THE ORIGINAL CHAPTER 11 PETITION, THE INITIAL SCHEDULES, AND THE STATEMENT OF FINANCIAL AFFAIRS
[Doc. No. 115]

## I. INTRODUCTION

The Court writes this Memorandum Opinion to emphasize the unwavering importance of ethical conduct in the practice of law, particularly regarding the filing of documents with the court. As one court recently noted:

> [w]hen a lawyer files a document with a court, such as a federal bankruptcy court, he or she takes an act of undeniable significance. It is of course important to, and it has potentially serious consequences for, his or her clients, who have entrusted their legal and financial affairs to the skill and integrity of the lawyer. It also has consequences—legally, professionally and ethically—to the lawyer. . . . And all schedules, the statement of financial affairs, and other documents must be not only signed by the debtor, but that signature must follow the debtor's verification, made under penalty of perjury, that the paper to which it is affixed has been reviewed and is true and correct to the best of the debtor's knowledge, information, and belief.

*In re Daw*, No. 09–00690–TLM, 2011 WL 231362, at *1 (Bankr. D. Idaho Jan. 24, 2011) (slip copy).

The case at bar involves an attorney, Calvin Braun (Braun), who failed to personally meet and review the Statement of Financial Affairs (SOFA) and Schedules with his client, Karl Stomberg (the Debtor), before filing them with this Court. Further, Braun filed these Schedules and SOFA without obtaining the signature or verification of the Debtor, and in fact forged the Debtor's signature using an electronic signature represented as a "/s/". There is more. The Court

1

learned about Braun's misconduct after this Court had already taken action against Braun for filing affidavits in this case containing material misrepresentations and for failing to disclose a conflict of interest—which were done in conjunction with his effort to obtain this Court's approval for him to represent the Debtor.  In fact, the show cause order issued in the case at bar is the sixth time since 2005 that Braun's poor conduct has caught this Court's attention.  Yet, despite having already been taken to task by this Court on numerous occasions, and having been admonished of the need to be truthful and candid, Braun ignored this continuing duty and thereafter attempted to cover up his filing of the Schedules and SOFA without obtaining the Debtor's signature.  This Memorandum Opinion discusses how Braun's improper preparation and illegal filing of the Debtor's original Schedules and original SOFA, as well as his cover-up of these misdeeds thereafter, has demonstrated a blatant disregard for the professional, legal, and ethical obligations required by both his status as an attorney and the judicial system.

## II. FINDINGS OF FACT

1. Braun, Monica Orlando (Ms. Orlando), and Michael "Gary" Orlando (Mr. Orlando) are partners in the law firm of Orlando & Braun LLP (the Firm).  [Doc. No. 76, p. 8].  Braun is a seasoned bankruptcy practitioner who has been licensed since 1992.  [June 7, 2011 Tr. 6:2–7].

2. In October of 2005, while affiliated with a different law firm, Ms. Orlando represented the Debtor in his divorce from Tammy M. Stomberg (Ms. Stomberg).  [Doc. No. 38, p. 7; Mar. 10, 2011 Tr. 7:8–18].

3. Sometime in 2006, the Debtor retained the Firm to advise him in the purchase of two businesses.  [Doc. No. 38, p. 8; Mar. 10, 2011 Tr. 8:7–12].

4.  In 2009, the Debtor hired Braun to represent one of his business ventures, Stomper Automotive, LLC, in a Chapter 11 case in the United States Bankruptcy Court for the Southern District of Texas.  [Doc. No. 38, p. 8–9 & 14; Mar. 10, 2011 Tr. 8:24; 9:9; 14:3–8; Dec. 1, 2011 Tr. 99:10–16].

5.  In late February or early March of 2010, Ms. Stomberg asked the Debtor if he could recommend a bankruptcy attorney to her.  [Mar. 10, 2011 Tr. 10:11–16].  The Debtor recommended Braun.  [Mar. 10, 2011 Tr. 10:7–16].  At this point, the Debtor and Ms. Stomberg were divorced.  [Mar. 10, 2011 Tr. 7:25–8:2].

6.  Soon thereafter, Braun met with Ms. Stomberg to discuss her potential bankruptcy case. [Doc. No. 38, p. 21; Mar. 10, 2011 Tr. 21:11–19].  Braun testified that at this meeting, he discussed with Ms. Stomberg the strengths and weaknesses of filing a petition under Chapter 7 versus Chapter 13.  [Doc. No. 38, p. 21–22; Mar. 10, 2011 Tr. 21:20–25; 22:1–8].  According to Braun, he advised Ms. Stomberg that the Firm would not be able to represent her if she opted to file for Chapter 13.  [Doc. No. 38, p. 22; Mar. 10, 2011 Tr. 22:9–13].  Braun also testified that he warned Ms. Stomberg that the Firm was representing the Debtor in various business transactions and that there was a possibility that Braun would file a bankruptcy petition on behalf of the Debtor himself; and that therefore, a conflict of interest could potentially arise that would force Braun to withdraw from Ms. Stomberg's representation.  [Doc. No. 38, p. 27–28; Mar. 10, 2011 Tr. 27:4–28:2].  In her testimony, however, Ms. Stomberg adamantly denied that Braun discussed his representation of the Debtor at this meeting.  [Doc. No. 38, p. 54 & 72; Mar. 10, 2011

3

Tr. 54:4–5; 72:15–19].  The Court believes Ms. Stomberg and expressly finds that Braun

did not discuss his representation of the Debtor with her.[1]

7.  Braun claims to have sent Ms. Stomberg a letter, dated May 18, 2010 entitled "Waiver of

Conflict" (the May 18 Letter), summarizing the above mentioned discussion Braun

claims he had with her.  [Doc. No. 38, p. 27–28; Mar. 10, 2011 Tr. 27:6–28:2].  The May

18 Letter reads as follows:

> Dear Ms. Stomberg:
>
> You have requested for our firm to represent you, Ms. Tammy M. Stomberg, in
> the filing and completion of a chapter 7 bankruptcy and we have advised you that
> we are currently representing your ex-husband, Mr. Karl C. Stomberg in regards
> to IRS representation and ultimately the filing of a chapter 11 bankruptcy . . . .
> We have informed you that there may be a [sic] both potential and actual
> conflicts as to certain information that we could be aware of in the future, which
> could be used in your and Mr. Stomberg's representation by this firm.  Although
> at this time, yours and Mr. Stomberg's interest [sic] are generally consistent in
> that the matters relate to child support and custody of the children.

[Braun's Ex. No. 3].  The May 18 Letter states that Braun fully disclosed "the potential

and possible actual conflicts" to Ms. Stomberg and that she had expressed to Braun that

she was willing to "waive such potential or actual conflicts."  [*Id.*].  Moreover, the

penultimate paragraph reads as follows: "It is understood that by your execution of the

---

[1] The Court makes this finding for three reasons.  First, when testifying in court, this Court carefully observed Ms. Stomberg and, as set forth in the Credibility Section of this Opinion, finds her to be a very credible witness whose testimony this Court gives substantial weight.  Second, when testifying in court, this Court carefully observed Braun and, as set forth in the Credibility Section of this Opinion, finds him not to be a credible witness and gives very little weight to his testimony.  See Section III, Credibility, for details on why this Court finds that Braun is not a credible witness.  Third, in his affidavit attached to his application to serve as the Debtor's counsel, Braun expressly set forth that he had no conflict of interest in representing the Debtor and that he represented no creditor of the Debtor.  [Doc. No. 7-1].  It was only after Ms. Stomberg filed an objection to this application that Braun eventually admitted that he did have a conflict due to his representation of Ms. Stomberg in her Chapter 7 case.  [Doc. No. 19].  Thus, Braun's initial representation to this Court—that he had no conflict—tracks with Ms. Stomberg's testimony that Braun never told her that his representation of the Debtor could pose a conflict for Braun in representing her.  For this Court to now find that Braun did, in fact, warn Ms. Stomberg that he would have a conflict representing her if he filed a Chapter 11 petition for the Debtor would contradict Braun's representation in his affidavit to this Court that he had no conflict of interest.  This, the Court will not do.  Indeed, Braun is estopped from asserting that he told Ms. Stomberg that he would have a conflict if he took on representation of the Debtor in a Chapter 11 when, in fact, Braun filed an affidavit saying that he had no conflict.  *See, e.g.*, *Rice v. Certain Underwriters at Lloyds*, No. H-10-4660, 2012 U.S. Dist. LEXIS 36445, at *7–8 (S.D. Tex. Mar. 19, 2012).  ("Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.").

chapter 7 bankruptcy schedules to be filed shortly that you are in full agreement to waive any and all conflicts which may or may not exist now or in the future." [*Id.*].  While the May 18 Letter was signed by Braun, Ms. Stomberg's signature does **not** appear on the copy submitted to this Court. [*Id.*].  Indeed, Ms. Stomberg denied ever signing the May 18 Letter. [Mar. 10, 2011 Tr. 56:16–18].

8.  Ms. Stomberg also denied ever receiving a copy of the May 18 Letter.  [Mar. 10, 2011 Tr. 56:9–13].   In fact, she testified that the first time she was notified of Braun's representation of the Debtor was the day she received a copy of the application to employ that Braun filed after initiating the Debtor's case in this Court.[2]  [Doc. No. 38, p. 54 & 74–75; Mar. 10, 2011 Tr. 54:4–11; 74:25–75:3].  The Court believes Ms. Stomberg and expressly finds that Braun never sent the May 18 Letter to her, never discussed it with her, never disclosed to her that he might represent the Debtor, and never disclosed to her that he had undertaken representation of the Debtor.  The Court also expressly finds that Ms. Stomberg never signed the May 18 Letter.[3]

9.  Ms. Stomberg decided to file bankruptcy under Chapter 7, and Braun undertook this representation and proceeded to file the petition on her behalf.  [Case No. 10-34625, Doc. No 1; Mar. 10, 2011 Tr. 28:5–6].  Ms. Stomberg's Chapter 7 petition was filed on May 31, 2010.  [Case No. 10-34625, Doc. No. 1].  Ms. Stomberg paid Braun $2,500 for him to represent her in this Chapter 7 case.  *See* [Case No. 10-34625, Doc. No. 10, p. 40 of 51] (see Rule 2016 disclosure of compensation indicating that the $2,500 was paid to Braun

---

[2] *See* [Finding of Fact Nos. 36 & 37] (regarding the application to employ).  Braun filed this pleading in the Debtor's case seeking approval from this Court to serve as general bankruptcy counsel for the Debtor.

[3] The Court makes this finding because it believes Ms. Stomberg and finds her to be very credible, as opposed to Braun, who is not credible.  See Section III, Credibility, for details on why this Court finds that Braun is not a credible witness.

prior to filing of the 2016 disclosure statement, which occurred on July 2, 2010). According to the Rule 2016 disclosure of compensation filed by Braun, this amount covered all aspects of the Chapter 7 case, except the following: "Any and all representation of Debtor(s) in contested proceeding(s) and/or adversary proceeding(s)." [*Id.*].

10. In August or September of 2010, Ms. Stomberg filed an enforcement action against the Debtor in the District Court of Harris County, Texas seeking to enforce the terms of their divorce decree. [Doc. No. 38, p. 53; Mar. 10, 2011 Tr. 53:7–18]. The enforcement action specifically involved child custody and support issues. [Doc. No. 38, p. 53; Mar. 10, 2011 Tr. 53:7–18].

11. On August 22, 2010, Ms. Stomberg completed her post-petition financial management course given to her by Money Management International, Inc. [Case No. 10-34625, Doc. No. 24, pg. 8 of 10]. Ms. Stomberg provided Braun with the Certificate of Debtor Education (the Certificate) that Money Management International, Inc. had given to her as evidence that she had, in fact, completed this course on personal financial management. [*Id.*]. Braun should have immediately filed the Certificate with the Clerk's Office to ensure that Ms. Stomberg would receive her discharge, yet he failed to do so.[4]

12. On November 5, 2010, Ms. Stomberg's Chapter 7 case was administratively closed without entry of a discharge because the Certificate was not filed. [Case No. 10-34625, Doc. No. 22]; [Mar. 10, 2011 Tr. 28:14–24]. According to Braun, Ms. Stomberg was

---

[4] To receive a discharge in a Chapter 7 case, a debtor must, among other requirements, take a post-petition financial management course. 11 U.S.C. § 111. Failure to take the course and file the certificate with the court will bar a debtor from receiving a discharge. *See* 11 U.S.C. § 727(a)(11). Because one of the major objectives of filing a Chapter 7 petition is to obtain a discharge in order to get a "fresh start," *In re Sanchez*, 372 B.R. 289, 290 (Bankr. S.D. Tex. 2007), Braun's failure to file the Certificate created a serious problem for Ms. Stomberg: it prevented her from obtaining her "fresh start."

indecisive about whether to reaffirm a particular debt and, therefore, they decided to allow the deadline to file the Certificate to pass in order to preserve Ms. Stomberg's right to reaffirm that debt.   [Doc. No. 38, p. 28–30; Mar. 10, 2011 Tr. 28:25–30:13].   Ms. Stomberg, on the other hand, testified that she had provided Braun with the Certificate before the deadline and expected him to file it to enable her to obtain her discharge. [Doc. No. 38, p. 57; Mar. 10, 2011 Tr. 52:7–15; 57:13–22].   The Court expressly finds that Ms. Stomberg's testimony is credible and that Braun's testimony is not credible; therefore, the Court expressly finds that Ms. Stomberg provided Braun with the Certificate and that he failed to file it.[5]

13. Soon after this Court closed Ms. Stomberg's Chapter 7 case without providing her a discharge, she discovered what had happened and attempted to contact Braun.  [Mar. 10, 2011 Tr. 54:5–8].  Braun, however, did not respond to either her e-mails or phone calls. [Mar. 10, 2011 Tr. 54:8–11].

14. Eventually, Braun did speak with Ms. Stomberg and told her that he would reopen her case and file the Certificate if she would pay him an additional $259.  [Mar. 10, 2011 Tr. 77:16–20].  Ms. Stomberg did, in fact, pay Braun the $259 on November 30, 2010.  [Mar. 10, 2011 Tr. 78:12–14].  Indeed, Ms. Stomberg actually made a payment of $300 on November 30, 2010.  However, only $259 of this payment went towards re-opening the case; the remainder went towards her outstanding balance owed to Braun.  [Mar. 10, 2011 Tr. 78:6–14, 39:5–13].[6]

---

[5] See the Section III, Credibility, for the details as to why this Court finds that Braun is not a credible witness.

[6] As already noted above in Finding of Fact No. 9, Braun's Rule 2016 disclosure of compensation represents to this Court that the $2,500 that Ms. Stomberg paid to him covered *all* matters relating to her Chapter 7 case, except: "Any and all representation of Debtor(s) in contested proceeding(s) and/or adversary proceeding(s)." [Case No. 10-34625, Doc. No. 10, p. 40 of 51].  Thus, Braun's insistence that Ms. Stomberg pay an additional $259 simply to

15. On December 7, 2010, Braun informed Ms. Stomberg that he would reopen her Chapter 7 case by the end of the week.  [Mar. 10, 2011 Tr. 77:19–20].  As already noted, the purpose of reopening her case was to file the Certificate and obtain a discharge.  Despite his assurance to Ms. Stomberg, Braun still failed to file the appropriate motion to reopen her Chapter 7 case so that the Certificate could be filed in order for her to obtain a discharge.  [Mar. 10, 2011 Tr. 39:9–16].

16. Meanwhile, Mr. Orlando, who was the Debtor's corporate counsel at the Firm [Mar. 10, 2011 Tr. 16:25–17:3], suggested to the Debtor the possibility of him filing a personal bankruptcy.  [Mar. 10, 2011 Tr. 15:3–9].  On December 22 or 23, 2010, the Debtor hired Braun to be his bankruptcy attorney.  [Dec. 1, 2011 Tr. 87:17–25].

17. On December 23, 2010, the Debtor went to the Firm's office and met with Braun.  [Dec. 1, 2011 Tr. 88:3–7].  One purpose of the meeting was for the Debtor to sign the Chapter 11 petition (the Petition), which he in fact did.  [Dec. 1, 2011 Tr. 11–18].  Then, Braun electronically filed the "barebones" Petition[7], which both he and the Debtor had signed, initiating the Debtor's Chapter 11 case.  [Doc. No. 1].  By signing the Petition as counsel for the Debtor, Braun became the attorney-in-charge of the Debtor's case.  *See* United States District Court for the Southern District of Texas Local Rule 11.1. ("On first

---

reopen the case [Mar. 10, 2011 Tr. 78:12–14] to do what Braun should have done previously—i.e., file the Certificate that Ms. Stomberg had given him so that she could obtain her discharge—violated the disclosure of compensation that Braun made to this Court.  Braun did not file an amended Rule 2016 disclosure of compensation informing this Court that he had received the additional $300.  Even if $259 of this $300 was for the court fee to re-open the case, the other $41.00 was for services rendered by Braun in the Chapter 7 case for which he made no amendment to his Rule 2016 disclosure of compensation.

[7] A bankruptcy petition filed without accompanying Schedules or SOFA is referred to as a "barebones" petition.

appearance through counsel, each party shall designate an attorney-in charge.  Signing the pleading effects designation.").[8]

18. Braun began working on the Debtor's bankruptcy case, and, through his legal assistant, Patricia Alcaraz (Alcaraz), collected information from the Debtor such as tax returns, pay stubs, vehicle numbers, and other items necessary to fill out the Debtor's SOFA and Schedules.  [Feb. 17, 2012 Tr. 56:16–17; Apr. 30, 2012 Tr. 24:1–2, 25:3–6].  Pursuant to Federal Rule of Bankruptcy Procedure 1007(c), the Debtor had fourteen (14) days from the date of the filing of the Petition to file the Schedules and SOFA.  Fed. R. Bankr. P. 1007(c).  Therefore, the deadline for filing the documents was January 7, 2011.  Braun was well aware of this deadline.

19. On December 28, 2010—five days after Braun filed the Petition on behalf of the Debtor—Ms. Stomberg, at Braun's insistence, paid him an additional $1,000.00.  [Mar. 10, 2011 Tr. 78:6–16]; *see also* [Doc. No. 1].  Ms. Stomberg testified that this payment covered the balance of the legal fees she owed Braun for her Chapter 7 case [Mar. 10, 2011 Tr. 78:6–16], and Braun admitted the same in an email to Ms. Stomberg sent on December 20, 2010, as well as in his testimony before this Court.  [Mar. 10, 2011 Tr. 39:9–13].  However, Braun had represented in the Rule 2016 disclosure of compensation that he had collected his entire $2,500 fee prior to filing this disclosure on July 2, 2010, and that this amount covered all aspects of the Chapter 7 case except representation in contested and/or adversary proceedings.  [Finding of Fact No. 9]; [Case No. 10-34625, Doc. No. 10, p. 40 of 51].  Since there were never any adversary proceedings and only one contested matter (a motion to lift stay for which Braun filed no response) in Ms.

---

[8] Bankruptcy Local Rule 1001-1(b) sets forth that the Local Rules of the District Court also govern practice in the Bankruptcy Court.  Thus, the attorney who signs a bankruptcy petition becomes the attorney-in-charge of a case just like the attorney who signs the original complaint in the district court becomes the attorney-in-charge of the lawsuit.

Stomberg's Chapter 7 case, any additional fees which Braun collected from Ms. Stomberg in December of 2010 were undisclosed and unapproved by this Court.

20. Ms. Stomberg testified that soon after Braun took this money, he ceased responding to her e-mails and telephone calls.[9]  [Doc. No. 38, p. 63; Mar. 10, 2011 Tr. 63:13–19]. Specifically, she sent Braun an "urgent" e-mail on January 3, 2011 asking him why he had not yet sought to have her case reopened, and she never received a response.  [Doc. No. 38, p. 81–82; Mar. 10, 2011 Tr. 81:23–82:6].  At this point, she still believed that Braun was her bankruptcy attorney for her Chapter 7 case.  [Mar. 10, 2011 Tr. 63:13–16].

21. On January 3, 2011, Alcaraz sent an email to the Debtor informing him of the date of his initial debtor's conference (the IDC) with the United States Trustee (the UST), and advising him to provide the necessary information to her for the IDC by January 7, 2011. [Braun Ex. No. 16, p. 158; Feb. 17, 2011 Tr. 83:5-17].

22. On January 4, 2011, Braun reviewed some of the information that the Debtor had given to Alcaraz to use in working up drafts of the SOFA and Schedules. [UST Ex. No. 8, p. 3].[10]  This was the last time that Braun reviewed any information relating to the Debtor's bankruptcy before the afternoon of January 7, 2011. [Apr. 30, 2012 Tr. 251:10–11].

23. On January 6, 2011, the Debtor visited the Firm's office and spoke with Alcaraz and Mr. Orlando regarding the SOFA and the Schedules. [Mar. 21, 2012 Tr. 104:11].

24. During this visit, the Debtor and Alcaraz met for approximately five minutes about the Schedules and the SOFA that Alcaraz was preparing [Mar. 1, 2012 Tr. 27:5; 27:17–18],

---

[9] As discussed in Section III, Credibility, this Court believes Ms. Stomberg's testimony to be very credible and therefore finds that Braun, soon after accepting money from Ms. Stomberg on December 28, 2010, ceased responding to Ms. Stomberg's e-mails and telephone calls.

[10] On his timesheet, Braun described the legal services that he provided on January 4, 2011 as a "review of email of completed forms provided to client to prepare schedules and statement of financial affairs[,]" and indicated that he spent 24 minutes on this task.  [UST Ex. No. 8, pg 2].

and Alcaraz did not review either the Schedules or the SOFA line by line with the Debtor.[11] [Mar. 1, 2012 Tr. 26:13–20; 26:23–25]. Alcarez testified that she saw the Debtor sign the original Schedules and original SOFA in black ink.[12] [Mar. 1, 2012 Tr. 36:15–16; 38:12–18]. Mr. Orlando was present at the office, but did not actually see the Debtor sign the Schedules and SOFA. [Mar. 21, 2012 Tr. 105:20–21]. At this time, Braun was not present at the office and therefore did not observe the Debtor sign the Schedules and SOFA. [Mar. 21, 2012 Tr. 97:22–98:1; 99:1].

25. After meeting with Alcaraz for approximately five minutes, the Debtor then went to Mr. Orlando's office and spoke with him for approximately five minutes regarding the Schedules and the SOFA, and then left the Firm's office. [Mar. 1, 2012 Tr. 27:5–21; Mar. 21, 2012 Tr. 98:1-8].[13]

26. The Court finds that the Debtor did not sign either the Schedules or the SOFA on January 6, 2011.[14] The Court makes this finding not only because it gives no weight to Alcarez's

---

[11] Although Alcarez testified that she did "go over" the Schedules and SOFA with the Debtor when he came to the Firm's office on January 6, 2011 [Mar. 1, 2012 Tr. 26:7–10], Alcarez really just provided the Debtor with the filled-out Schedules and SOFA and told him to look them over. [Mar. 1, 2012 Tr. 26:13–20]. In fact, Alcarez could not have reviewed the Schedules and SOFA line by line with the Debtor because five minutes is simply not enough time in which to do so.

[12] Due to multiple inconsistencies in her testimony, this Court finds Alcaraz's testimony regarding Stomberg's signing of the Schedules and of the SOFA to be wholly unreliable. This Court discusses Alcarez's lack of credibility in the Credibility section of this Opinion.

[13] Mr. Orlando's time entry for the afternoon of January 6, 2011 includes an entry stating that he had a "Conference with client regarding execution of schedules and financial affairs." [UST Ex. No. 8, pg. 3]. While this Court finds that this meeting occurred, the Court does not believe that such a meeting is evidence that the Debtor actually signed the Schedules and the SOFA. Indeed, the Court expressly finds that the Debtor never signed the original Schedules and original SOFA.

[14] The Court finds the likeliest scenario to be that Stomberg stopped by the office, but the Schedules and SOFA were not yet completed—thus, he did not sign them. The Court also believes that this is reconcilable with Mr. Orlando's time sheet entry, in that Stomberg stopped by Mr. Orlando's office to let him know that he had not signed the forms. Indeed, Mr. Orlando, when asked how many times the Debtor came to the Firm's office before the Petition was filed, responded as follows: "I can't place an exact number, but Mr. Stomberg was always in and out of our office. Many times he would just show up and step in and ask me a question or call me on my cell phone or call me at the office requesting information concerning, you know, business transactions." [Mar. 21, 2012 Tr. 71:12–16].

testimony, but—more importantly—neither Braun nor Mr. Orlando nor Alcarez have ever produced the "wet signed" (i.e., signed in ink by the Debtor) original Schedules and "wet signed" original SOFA (which Braun, as attorney-in-charge, is required to preserve and keep in possession for five years); nor have they ever produced even copies of the "wet signed" original Schedules and original SOFA.

27. Braun finally reviewed the Schedules and SOFA, which Alcarez had prepared, on the afternoon of January 7, 2011.  [Apr. 30, 2012 Tr. 162:4–12].  As already noted, January 7, 2011 was the deadline for the filing of the Schedules and SOFA.  [Finding of Fact No. 18].  Three phone conversations occurred among the Debtor and the partners at the Firm on this date.  The first call occurred at 5:35 P.M. between the Debtor, Mr. and Ms. Orlando, and Braun, and lasted for 45 minutes.  [Braun Ex. No. 21, p. 86].  The second call was between Braun and the Debtor and occurred at 6:28 P.M., lasting for 8 minutes.  [Braun Ex. No. 21, p. 86].  The third occurred between Braun and the Debtor at 6:57 P.M., and lasted for 11 minutes.  [Braun Ex. No. 21, p. 86].  When holding these telephone conversations, Braun and the Orlandos were at the Firm's office, and the Debtor was at home.  [Mar. 21, 2012 Tr. 75:9–13].  Braun did not ensure that the Debtor (while at home during the telephone conversations) had a copy of the Schedules and SOFA in front of him—Braun only presumed that he did.  [Apr. 30, 2012 Tr. 169:3–13; 217:1–14].

28. These telephone conversations occurred because upon finally reviewing the draft Schedules and the SOFA that Alcaraz had prepared using information given to her by the Debtor, Braun concluded that there were "some issues that doesn't [sic] really make

---

Therefore, it would not have been out of the ordinary for the Debtor to drop by unannounced in order to check on the status of Alcarez's preparation of the Schedules and SOFA, determine that they were not yet ready for him to sign, and, therefore not sign the Schedules or the SOFA at that time.

sense in what I have in these Schedules for filing." [Mar. 21, 2012 Tr. 74:22–24]. In particular, Braun expressed concern to his partners that, given the size of the Debtor's home, more items of personal property should have been listed. [Apr. 12, 2012 Tr. 33:11–22]. After reviewing the Schedules and SOFA with Braun, Ms. Orlando initiated the first phone call to the Debtor (at 5:35 P.M.) in order to discuss the issues about which Braun had expressed concern to the Orlandos. [Apr. 12, 2012 Tr. 34:17–20].

29. During the 45-minute phone call, Braun, Mr. Orlando, and Ms. Orlando had Stomberg walk through his house and verbally state how many items that he had in his possession, ranging from couches to oil paintings. [Mar. 21, 2012 Tr. 75:2–6]. Braun then made changes to the draft Schedules—specifically Schedules B and C—after the Debtor provided the information about his household furnishings.[15] [Mar. 21, 2012 Tr. 75:12–13]; [Apr. 30, 2012 Tr. 212:8–18; 266:12–20].

30. After the 45 minute phone call, Ms. Orlando and Mr. Orlando left the Firm's office for a previously scheduled engagement. [UST Ex. No. 8, p. 4]. The remaining two calls—the one at 6:28 P.M. lasting for 8 minutes, and the other at 6:57 P.M. lasting for 11 minutes [Braun Ex. No. 21, p. 86]—were solely between Braun and the Debtor, and also concerned changes which Braun made to the drafts of the Schedules. *See* [Apr. 30, 2012 Tr. 209:14–16].

31. Approximately one hour after the third phone call, at 8:06 P.M. on January 7, 2011, Braun filed these Schedules and SOFA electronically with the Clerk of Court. [Mar. 21, 2012 Tr. 74:1–2; Doc. No. 5]. Braun never met with the Debtor in person to review the Schedules or the SOFA before filing them. [Apr. 30, 2012 Tr. 208:25–209:5; 251:2–11].

---

[15] On Schedule B, the debtor must list all personal property owned on the date of filing, its location, and its value. On Schedule C, the debtor must list which property he claims as exempt.

32. When electronically filing the Schedules and SOFA at 8:06 P.M. on January 7, 2011, Braun represented, using an electronic signature "/s/", that he had obtained the Debtor's signatures on both the Schedules and the SOFA.   [Doc. No. 5].   Yet, when he electronically filed these documents, he knew that (a) the Debtor had not personally reviewed the actual documents being filed; and (b) the Debtor had not signed these documents.

33. Despite this representation, Braun had not actually obtained the Debtor's signature on the Schedules or the SOFA.[16]   [Dec. 1, 2011 Tr. 93:23–94:17].   Moreover, there is no evidence that the Debtor, over the phone, orally authorized Braun to sign on his behalf. [Dec. 1, 2011 Tr. 91:19–23].

34. Braun also never obtained the Debtor's signature on the Declaration for Electronic Filing, nor did he ever tender the Declaration for Electronic Filing to the Court.   [Doc. No. 139, p. 1 of 3].

35. The Debtor's Schedule E lists Ms. Stomberg as a Priority Creditor holding an unsecured priority claim for $20,000.00 arising out of the Final Decree of Divorce between Ms. Stomberg and the Debtor.[17]   [Doc. No. 5].

36. On January 10, 2011, on behalf of the Debtor, Braun filed the Debtor's Application to Employ Orlando & Braun LLP as Counsel for Debtor (the Application to Employ), in

---

[16] Additionally, even if the Court accepted Braun's assertion (which it does not) that the Debtor had signed drafts of the Schedules and the SOFA during his visit to the Firm's office on January 6, 2011, thereafter the Debtor never signed off on the changes that Braun made to Schedules B and C during and after the phone calls that took place on the evening of January 7, 2011.  [Apr. 30, 2012 Tr. 167:1–3; 212:8–18; 263:8–17; 264:5–8; 265:9–17; 266:12–17]. Braun himself admitted this, testifying that he made a "judgment call" to file these two Schedules without obtaining the Debtor's wet signature on either of them.  [Apr. 30, 2012 Tr. 212:14–18]

[17] The Final Decree of Divorce was entered on or about October 7, 2005 by the 257th Judicial District Court of Harris County, Texas in Cause No. 2005-50085. [Doc. No. 15].

which Braun was designated as the attorney-in-charge for the Debtor's Chapter 11 case.

[Doc. No. 7].

37. Paragraphs seven and eight of the Application to Employ made the following representations to this Court and to the Debtor's creditors:

> 7. As disclosed in the attorney's affidavit attached hereto as Exhibit "A," [neither] the firm of Braun nor any of its members, represented Debtor prior to the filing of Debtor's Chapter 11 case. To the best of Debtor's knowledge and except as otherwise disclosed in the attorney's affidavit, neither Braun nor any of its members has any other connection with Debtor, Debtor's creditors, equity security holders, or any other parties in interest . . . .

> 8. To the best of Debtor's knowledge and except as otherwise disclosed in the attorney's affidavit attached hereto as Exhibit "A" neither Braun nor any of its members holds or represents any interest adverse to Debtor [sic] estate in the matter on which Braun is to be engaged by Debtor and Braun, [sic] its members are "disinterested persons" within the meaning of Section 101(3) of the Bankruptcy Code.

[Doc. No. 7, p. 3-4, ¶¶ 7-8]. The certificate of service accompanying the Application to Employ lists "Tami Stomberg" as a creditor or party of interest who must be notified of the Application pursuant to Bankruptcy Rule 2002. [Doc. No. 7, p. 7].

38. Braun executed the Affidavit of Proposed Attorney and Rule 2016(b) Disclosure (the Original Affidavit) that is attached to the Application. [Doc. No. 7–1]. In the Original Affidavit, Braun swears under oath that:

> 4. Prior to the filing of Debtor's Chapter 11 case, Calvin Braun advised and represented Karl C. Stomberg (hereinafter jointly known as "Debtor") regarding various financial restructuring alternatives. Neither Braun nor its members, except as stated[,] has ever previously represented the Debtor.

> 5. Except as set forth herein,[18] neither I nor any other person associated with [Orlando & Braun, LLP] has represented and otherwise dealt with, or is now representing and otherwise dealing with, any entity that is or may consider itself a creditor, equity security holder or party in interest . . . . Braun is a "disinterested person" within the meaning of Section 101(13) of the Bankruptcy Code.

> 6. To the best of my knowledge, neither I nor any other member of [Orlando & Braun, LLP] represents or holds any interest adverse to the Debtor or its estate or

---

[18] The remainder of the Original Affidavit did not set forth any exceptions to paragraph 5.

have any interest materially adverse to the interest of any class of Debtor's creditors or equity security holders.

[Doc. No. 7–1, p. 2–3, ¶¶ 4–6].

39. As previously noted, Ms. Stomberg received a copy of the Application to Employ in the mail. *See* [Finding of Fact No. 8]. She testified that she became immediately concerned for several reasons. First, who would represent her in her reopened bankruptcy case if Braun was representing the Debtor in his bankruptcy case? [Doc. No. 38, p. 82; Mar. 10, 2011 Tr. 82:11–22]. She was listed as a creditor in the Debtor's Schedule E for the amount of $20,000 in child support payments. Second, how would her rights as a creditor be affected in the Debtor's Chapter 11 case if her own bankruptcy attorney was representing the Debtor? [Doc. No. 38, p. 83–84; Mar. 10, 2011 Tr. 83:7–84:6]. Third, how would Braun's simultaneous representation of both her ex-husband and her affect her pending enforcement action in state court? [Doc. No. 38, p. 63; Mar. 10, 2011 Tr. 63:17–24].

40. On January 10, 2011, the Debtor and Braun attended the IDC at the UST's Office. [Feb. 17, 2012 Tr. 26:9]. Clarissa Waxton (Waxton), a bankruptcy analyst for the UST, conducted the IDC. [Feb. 17, 2012 Tr. 20:20–21].[19]

41. Waxton did not remember the actual IDC with the Debtor, as she has conducted approximately two IDCs a week for the past nine years. [Feb. 17, 2012 Tr. 21:21–22:2; 26:18–25]. However, Waxton utilized an "Initial Debtor Interview Checklist" (the Checklist) as a guide for what questions to ask the Debtor, and recorded the Debtor's responses on either the Checklist, the Schedules, or her own notes. [Feb. 17, 2012 Tr.

---

[19] Debtors are not under oath at the IDCs, but the UST relies on a debtor's responses to prepare for the § 341 meeting, when the debtor is under oath. [Feb. 17, 2012 Tr. 21:25–22:2; 50:4–6].

27:7–13]; *see also* [Braun Exhibit No. 3, pg. 38].  The Checklist reveals that at the IDC, Waxton recorded the Debtor's responses to the following questions: "Did the debtor review and understand the schedules and SOFA that he or she signed?" as well as "Did the debtor sign the schedules and SOFA?" [Braun Ex. No. 3, pg. 38, items 15 & 16].  The Checklist further indicates that both of these questions were answered affirmatively.  [*Id.*].  However, the Checklist does not indicate whether the Debtor himself answered the questions or whether Braun answered on the Debtor's behalf.  [*Id.*]; [Feb. 17, 2012 Tr. 29:11–15; 48:12–18].[20]

42. On January 24, 2011, Ms. Stomberg filed a pleading entitled: Opposition to Application to Employ Counsel Filed by Debtor and Debtor in Possession (the Opposition Response).[21]   [Doc. No. 15].   In the Opposition Response, Ms. Stomberg accurately asserted that:  (1) she is the Debtor's Ex-Wife; (2) the Debtor's proposed counsel (i.e., Braun) represented her in a Chapter 7 case filed on May 31, 2010, which was closed without discharge because Braun failed to file the required Certificate of Debtor Education; (3) the Application to Employ failed to disclose Braun's prior representation of Ms. Stomberg; (4) she had filed an expedited motion to reopen her bankruptcy case;[22] (5) the Debtor had scheduled her as a priority creditor holding a $20,000 priority claim arising out of the Debtor's and Ms. Stomberg's October 2005 Final Decree of Divorce;

---

[20] Waxton could not state, one way or the other, whether the Debtor or Braun answered the questions that she posed at the IDC.  [Feb. 17, 2012 Tr. 48:15–18].

[21] In mid January of 2011, Ms. Stomberg, having realized that Braun had shunted aside his representation of her in order to take on the representation of her ex-husband, retained John V. Burger (Burger) to replace Braun as her counsel in the Chapter 7 case.  [Doc No. 38, p. 82; Mar. 10, 2011 Tr. 82:7–9].  Burger then filed the Opposition Response.

[22] Burger also filed this pleading, as Braun, despite promising Ms. Stomberg on December 7, 2011 that he would do so [Mar. 10, 2011 Tr. 77:19–20], and despite accepting the additional amount of $259.00 from Ms. Stomberg [Mar. 10, 2011 Tr. 78:12–14], never fulfilled his commitment to do so.

(6) at the time the Debtor filed his Chapter 11 Petition, Ms. Stomberg had just recently filed an enforcement action in Harris County District Court to enforce obligations under the divorce decree; and (7) the enforcement action may be subject to the automatic stay. [Doc. No. 15, p. 1–2].   Based on the aforementioned circumstances, Ms. Stomberg argued that: (a) Braun's representation of the Debtor was materially adverse to her rights as Braun's client; (b) Braun was not disinterested; and (c) "the inherent conflict between Creditor [i.e., Ms. Stomberg] and Debtor is fatal to Proposed Counsel's employment as counsel for the Debtor."  [Doc. No. 15, p. 2].

43. Also on January 24, 2011, Burger, on behalf of Ms. Stomberg, filed a Motion to Reopen Case to File Certificate of Debtor Education and to Obtain a Discharge in her Chapter 7 case (the Motion to Reopen).  [Case No. 10-34625, Doc. No. 24].  Additionally, Ms. Stomberg filed the Certificate with the Clerk of Court.  [Case No. 10-34625, Doc. No. 25].

44. On January 28, 2011, this Court granted the Motion to Reopen.  [Case No. 10-34625, Doc. No. 26].  Thus, Burger accomplished what Braun had promised—but failed—to do for Ms. Stomberg.

45. Also on January 28, 2011—four days after Ms. Stomberg filed the Opposition Response—Braun filed a First Amended Affidavit of Proposed Attorney and Rule 2016(b) Disclosure (the Amended Affidavit).  [Doc. No. 19].  In the Amended Affidavit, Braun disclosed—among other things—that he had, in fact, represented Ms. Stomberg in her Chapter 7 case.  [Doc. No. 19, p. 2–3, ¶ 4].  Paragraph four of the Amended Affidavit specifically states that:

> Prior to the filing of Debtor's Chapter 11 case, Calvin Braun advised and represented Karl C. Stomberg (hereinafter jointly known as "Debtor") regarding various financial restructuring alternatives.   Additionally, Monica Orlando,

18

partner in [Orlando & Braun, LLP], previously represented Karl Stomberg at her previous firm of Meyer, Knight, & Williams, LP in the divorce of Karl and Tammy Stomberg in October 2005[;] Calvin Braun represented Tammy Stomberg in a chapter 7 filed in Southern District at case number 10-34625-H4-7 which was administrative [sic] closed on November 5, 2010[;] and finally Calvin Braun represented the company of Stomper Automotive, LLC in the filed chapter 11 case in the Southern District of Texas at case number 09-36249-H4-11 which was dismissed on 12-18-2009, except as herein stated has not ever previously represented the Debtor.

Similar to the Original Affidavit, Braun still inaccurately represented that, except as explicitly admitted in the Amended Affidavit, neither he nor the Firm "has represented and otherwise dealt with, or is now representing and otherwise dealing with, any entity that is or may consider itself a creditor, equity security holder or party in interest . . . ." [Doc. No. 19, p. 3, ¶ 5].  Additionally, just as he misrepresented in the Original Affidavit, [Doc. No. 7-1, p. 3, ¶ 5], Braun also inaccurately represented that to the best of his knowledge, neither he nor any other member of his firm "represents or holds any interest adverse to the Debtor or its estate or have any interest materially adverse to the interest of any class of Debtor's creditors or equity security holders."  [Doc. No. 19, p. 3, ¶ 6]. Finally, in the Amended Affidavit, Braun failed to disclose that he had taken an additional $300.00 from Ms. Stomberg just 23 days before filing the Petition initiating her ex-husband (i.e., the Debtor's) Chapter 11 case and that he failed to seek to have her Chapter 7 case re-opened, as he promised her, so that she could obtain her discharge.

46. On January 31, 2011, as a result of Burger's filing of the Motion to Reopen and Ms. Stomberg's filing of the Certificate, this Court entered an order discharging Ms. Stomberg.  [Case No. 10-34625, Doc. No. 27].  Thus, Burger was able to assist Ms. Stomberg in obtaining her discharge, when Braun should have done so several weeks previously.

47. Also on January 31, 2011, once the discharge order was entered, Ms. Stomberg's Chapter 7 case was closed. [Case No. 10-34625, Doc. No. 27].

48. On February 17, 2011, the Debtor and Braun attended the first meeting of creditors in the Debtor's Chapter 11 case. [Dec. 1, 2011 Tr. 59:16–18]. The UST[23] swore the Debtor in at the beginning of this meeting. [Apr. 30, 2012 Tr. 36:13–15]. The UST then asked the Debtor if he "[h]ad an opportunity to examine the Petition and Schedules and Statements that have been filed by your attorney, Mr. Braun, in this matter?" [Apr. 30, 2012 Tr. 36:19–24]. The Debtor's response was vague and non-responsive. He stated, "I have some, but he's always." [Apr. 30, 2012 Tr. 36:24]. His answer seems to indicate that he had not really examined the Schedules and the SOFA that were filed. However, when the UST followed up by asking the Debtor, "to the best of your knowledge, is the information contained in these documents true and correct?" the Debtor responded, "[y]es." [Apr. 30, 2012 Tr. 37:1–5]. The UST also asked, "are you aware of any changes, additions, or deletions at this time that need to be made?" to which the Debtor responded, "[n]o." [Apr. 30, 2012 Tr. 37:7–10].

49. On March 10, 2011, after a hearing on the Application to Employ and the Opposition Response, this Court denied the Application to Employ, discharging Braun as the Debtor's counsel due to the fact that he had filed an affidavit containing materially false statements in connection with the Application to Employ. [Mar. 10, 2011 Tr. 95:21–23]. Additionally, the Court was concerned with the fact that Braun did not attempt to correct his affidavit until after Ms. Stomberg, who was listed as a creditor on the Debtor's Schedules, brought to light his concurrent representation of both herself and the Debtor. [Mar. 10, 2011 Tr. 94:5–8; 95:2–4; 96: 8–12].

---

[23] Reference to the UST actually refers to the attorney for the UST.

50. On March 22, 2011, the Debtor drove to the Firm's office for the purpose of picking up the file containing all of the documents Braun had maintained on the Debtor's case before this Court removed Braun as the Debtor's attorney by denying the Application to Employ. [Mar. 21, 2012 Tr. 35:13–14].  Benjamin Schlitt (Schlitt), a paralegal at the Firm [Mar. 21, 2012 Tr. 12:18–19], provided the Debtor with the original file when the latter came to the Firm's office.  [Mar. 21, 2012 Tr. 20:9–17, 35:13–14].  The Debtor then took this file and drove over to the law office of Barbara Rogers (Rogers) [Apr. 30, 2012 Tr. 75:6–10], who had agreed to represent the Debtor as counsel in his Chapter 11 case. [Apr. 12, 2012 Tr. 132:7–10].  When Rogers subsequently reviewed the file, she found that the file lacked: (1) the original SOFA with the Debtor's "wet signature"; and (2) the original Schedules with the Debtor's "wet signature".[24]  [Apr. 12, 2012 Tr. 133:25–134:4].  Syria Sinoski, Rogers' intern at the time, who had also reviewed the file, confirmed this finding.  [Apr. 30, 2012 Tr. 148:3–12].

51. On March 30, 2011, the Debtor filed his Application to Employ Rogers & Anderson, PLLC as Debtor's Counsel, with Rogers as attorney-in-charge.  [Doc. No. 41].

52. On March 31, 2011, this Court granted the Application to Employ Rogers & Anderson, PLLC as Debtor's Counsel.  [Doc. No. 42].

53. On April 25, 2011, this Court issued an Order Requiring Calvin Braun to Appear and Show Cause Why He Should Not Be Sanctioned For His Conduct in This Chapter 11 Case (the First Show Cause Order).  [Doc. No. 58].  The First Show Cause Order set forth that in the Application to Employ and in the Original Affidavit accompanying the

---

[24] Rogers' testimony also reflects that there were no copies of the original Schedules and the original SOFA reflecting that the Debtor had signed these documents.

Application to Employ, Braun had failed to disclose his or the Firm's connection to Ms.

Stomberg.  [*Id.*].  The First Show Cause Order required the following:

> Braun shall appear at this hearing and show cause why he should not be
> sanctioned for: (1) concurrently representing the Creditor [i.e., Ms.
> Stomberg] and the Debtor when doing so violated the Texas Disciplinary
> Rules governing conflict of interest; (2) falsely asserting to this Court that
> neither he nor any of his partners had represented any creditors when he in
> fact had represented the Creditor [i.e., Ms. Stomberg] in her Chapter 7
> case; (3) failing to disclose to this Court his relationship with the Creditor
> [i.e., Ms. Stomberg]; (4) falsely asserting to this Court that, other than
> representing the Debtor in "various financial restructuring alternatives,"
> neither he nor any of his partners had previously represented the Debtor;
> (5) failing to disclose Monica Orlando's prior representation of the Debtor
> in his divorce from the Creditor [i.e., Ms. Stomberg]; and (6) failing to
> disclose that he had represented one of the Debtor's businesses [i.e.,
> Stomper Automotive, LLC] in a previous bankruptcy case.

[Doc. No. 58, p. 20-21].

54. On June 7, 2011, Braun appeared before this Court to respond to the First Show Cause

Order.  [Doc. No. 72].  After hearing the testimony and listening to closing arguments,

this Court—as it had done several times in the past—admonished Braun to be more

attentive to detail and more careful with his work.  [June 7, 2011 Tr. 61:18–22; 62:17–19;

59:4–10; 59:21–25].  The Court also ordered Braun to return to Ms. Stomberg all of the

monies that she had paid him to represent her in her Chapter 7 case.  Additionally, the

Court ordered Braun to pay $2,400.00 to Mr. Burger, representing the amount of fees he

had charged Ms. Stomberg to re-open her Chapter 7 case, to prosecute the Opposition

Response, and to attend and participate at the hearing on the First Show Cause Order.

[Doc. No. 72]; *see also* [Feb. 7, 2011 Tr. 65:24–66:14].  Finally, at the suggestion of

Leonard Simon (Simon), the attorney who represented Braun at the hearing on the First

Show Cause Order, the Court also ordered Braun to enter into a mentoring program with Simon.[25]  [Doc. No. 72].

55. On or about October 10 or 11, 2011, Rogers happened to see Braun at the courthouse and, recalling that the file that the Debtor had delivered to her did not contain the Debtor's "wet signatures" on either the original Schedules or the original SOFA, asked Braun whether he had kept the original "wet signed" Schedules and SOFA.  [Apr. 12, 2012 Tr. 81:13–14].   Braun indicated that he would locate them and provide them to Rogers.  [Apr. 12, 2012 Tr. 81:7–19].

56. On October 12, 2011, Rogers and Braun had a follow-up phone conversation regarding the "wet signatures" on the original Schedules and original SOFA. [Apr. 12, 2012 Tr. 84:16–23].  At this time, Braun indicated that he had the "wet signed" Petition, but was unable to locate the "wet signed" original Schedules and the "wet signed" original SOFA, or even copies of them, at his office.   [Apr. 12, 2012 Tr. 82:23–25; 138:11–14]. According to Rogers, Braun sounded very distressed by his inability to find these documents and told her that he would investigate further to see if he could determine what happened to these documents.  [Apr. 12, 2012 Tr. 83:2–10].

57. On October 18, 2011, Braun met with the Debtor at the Firm's office and asked him to sign in blue ink the Schedules and the SOFA that Braun had filed over nine months earlier, on January 7, 2011.  [Apr. 30, 2012 Tr. 189:3–11].  Braun wanted to obtain the Debtor's "wet signature" on the original Schedules and the original SOFA because he was nervous about the fact that he did not have these original Schedules and SOFA with the Debtor's "wet signatures" in his possession.  *See* [Apr. 30, 2012 Tr. 80:3–4].  When

---

[25] Simon has also represented Braun at the hearing on the Second Show Cause Order.

the Debtor informed Braun that he would not sign the original Schedules and SOFA without the advice and approval of his present bankruptcy counsel (i.e., Rogers) [Apr. 30, 2012 Tr. 79:22–25; 80:5–8], Braun became upset with him.  [Apr. 30, 2012 Tr. 80:17–18].  The Debtor then left the Firm's office with the original Schedules and the original SOFA which Braun had asked him to sign, drove to Rogers' office, and delivered these documents to Rogers.  [Apr. 30, 2012 Tr. 81:20–24]; [Apr. 12, 2012 Tr. 88:3–8].  Rogers advised the Debtor not to sign these documents.  [Apr. 12, 2012 Tr. 89:10–12].  Although the Debtor told Rogers, prior to his arrival at the Firm's office, that he was going to meet with Braun [Apr. 30, 2012 Tr. 80:22–24; 81:6–9], Braun himself never notified Rogers of his meeting with the Debtor nor of his intent to have the Debtor sign the original Schedules and original SOFA that he had previously filed; nor did he obtain Rogers' permission to meet with the Debtor.  Rather, Rogers testified that she did not speak to Braun until *after* the Debtor delivered the original, unsigned Schedules and SOFA to her, which were dated January 7, 2011 and contained green tabs where the Braun sought to have the Debtor sign.  [Apr. 12, 2012 Tr. 90:2–9].  The Court finds that Braun did not seek Rogers' permission prior to communicating and meeting with the Debtor in an attempt to have the Debtor wet sign the original Schedules and the original SOFA.

58. Later that same day (i.e., on October 18, 2011), Mr. Orlando sent an email to the Debtor stating, "We [the Firm] feel we are being treated like step-children . . . I forced Calvin to file for you and now we are concerned we are going to get screwed again, since you refused to sign the schedules."  [UST Ex. No. 12].[26]

---

[26] Mr. Orlando indicated that he does not practice bankruptcy law, but, because he had represented the Debtor in various business matters for several years, requested his partner, Braun, who does practice bankruptcy, to file the Petition.  [Apr. 12, 2012 Tr. 24:1–25:5].  Mr. Orlando's statement that he "forced Calvin to file for you" is a reference to Mr. Orlando's request for Braun to miss one day (i.e., December 23, 2010) of a scheduled multi-day

59. On September 12, 2011, this Court entered on the docket a letter that it received from Ms. Stomberg.  [Doc. No. 92].  In this letter, Ms. Stomberg alleged that the Debtor was deliberately deceiving this Court and abusing the bankruptcy process by filing incorrect income numbers in his monthly operating reports and failing to disclose a family vacation.  [Doc. No. 92].

60. In response to this letter, the Court issued an Order Requiring the Debtor to Appear and Respond to Allegations by Tammy Cromwell Stomberg that He is Knowingly Filing False and Material Declarations with this Court.  [Doc. No. 95].

61. On December 1, 2011, this Court held a hearing pursuant to the above-referenced show cause order.  [Doc. No. 95].  The Debtor and his family law attorney explained the differences between the income figures disclosed in the Family Law Court and the income figures disclosed in this Court, and also testified that the income figures submitted to the Family Law Court, while not correct, were not submitted under oath, and that the numbers submitted under oath to this Court were, in fact, the correct figures. [Dec. 1, 2011 Tr. 129:13–16; Dec. 1, 2011 Tr. 55:20–23].

62. Additionally, at the hearing on December 1, 2011, the Debtor testified that the original Schedules and SOFA that Braun filed on January 7, 2011 contained numerous inaccuracies.[27]  [Dec. 1, 2011 Tr. 62:15–20; 64:10–14].  The Debtor also testified that

---

vacation in order to meet with the Debtor, obtain the Debtor's signature on the Petition, and then file the Petition. [Apr. 12, 2012 Tr. 24:21–25:15]

[27] To correct the inaccuracies in the original Schedules and the original SOFA, the Debtor, through his attorney, Rogers, filed amended Schedules and an amended SOFA on November 14, 2011.  [Doc. Nos. 101 & 102].  There were definitely material inaccuracies.  For example, the amended Schedule F reflects the addition of an unsecured creditor named David J. Disiere holding a claim of $231,232.68.  [Doc. No. 101, p. 17].  Further, the amended Schedule B discloses the existence of a business owned by the Debtor entitled "Crave Luxury Auto Export" and also a business in which the Debtor is involved entitled "Southern Luxury Motorcars, LLC."  [Doc. No. 101, p. 6]. Meanwhile, the amended SOFA discloses that in November of 2009, the Debtor sold a Rolex watch to a jewelry store for $7,500 and that in May of 2010, the Debtor transferred 51% of his ownership of Southern Luxury

Braun never had a face-to-face meeting with him to review the Schedules and SOFA before Braun filed them on January 7, 2011.  [Dec. 1, 2011 Tr. 39:17–23; 40:12-20]. Aside from having no face-to-face meeting with Braun before Braun filed the Schedules and SOFA on January 7, 2011, the Debtor also testified that he (i.e., the Debtor) never reviewed the Schedules and SOFA before Braun filed them on January 7, 2011.  [Dec. 1, 2011 Tr. 42:6–12].  Moreover, the Debtor testified that he **never signed** the original Schedules or original SOFA.  [Dec. 1, 2011 Tr. 93:23–94:17].  The Court finds the Debtor credible in this particular testimony and, therefore, finds that: (a) prior to Braun filing the Schedules and SOFA at 8:06 P.M. on January 7, 2011, Braun never had a face-to-face meeting with the Debtor to review the Schedules and SOFA[28]; *and* (b) the Debtor himself never reviewed these documents before Braun filed them.

63. Based on the testimony from the Debtor at the December 1, 2011 hearing that he had never reviewed or signed the original Schedules and SOFA filed by Braun on January 7, 2011, this Court—which had already taken action against Braun for his patently false representations in the Application to Employ [Finding of Fact Nos. 49, 53 & 54]—once more became concerned with Braun's conduct during his time as counsel for the Debtor. [Doc. No. 115].

64. On December 1, 2011, this Court entered an Order Granting Motion to Convert Case to Chapter 7.  [Doc. No. 108].  Rogers, with the Debtor's consent, had filed a motion to

---

Motorcars, LLC to his present wife, Kristin Stomberg.  [Doc. No. 102, p. 3].  All of these amended disclosures were material.  Indeed, one of the Debtor's creditors, Ms. Stomberg, was very interested to learn (and had the right to know) that the Debtor had transferred 51% of his ownership of Southern Luxury Motorcars, LLC to his present wife.  If Braun had only done what Rogers in fact did—namely, personally meet with the Debtor and review the accuracy of all of the information in the Schedules and the SOFA line by line—there would not have been any initial material misrepresentations in the original Schedules and the original SOFA, and therefore there would not have been any need to make amendments.

[28] Braun himself admitted that he never met with the Debtor in person to review the original Schedules and original SOFA prior to filing them on January 7, 2011.  [Apr. 30, 2012 Tr. 208:25–209:5; 251:2–11]

convert because the Debtor had concluded that he could not obtain a confirmed plan of reorganization given his expected level of income in the future and his overwhelming debt.

65. On December 8, 2011, due to this Court's renewed concern about Braun's conduct, this Court issued another show cause order to Braun entitled: Order Requiring Calvin Braun to Appear and Show Cause Why He Should Not be Sanctioned for Conduct Described herein with Respect to Filing of the Original Chapter 11 Petition and the Initial Schedules and the Statement of Financial Affairs (the Second Show Cause Order). [Doc. No. 115]. The Second Show Cause Order requires Braun to show cause why he should not be sanctioned for the following: (1) filing the Debtor's Chapter 11 Petition with an "/s/" next to the Debtor's name when in fact the Debtor had not signed the Petition; (2) filing the initial Schedules and initial SOFA under the same circumstances; (3) never obtaining the Debtor's signature on the Declaration for Electronic Filing; (4) never tendering an executed Declaration for Electronic Filing to the Court; and (5) never meeting with the Debtor prior to filing the initial Schedules and SOFA to review with him the accuracy of the information contained therein. [Doc. No. 115].

66. The hearing on the Second Show Cause Order required several days of testimony due to the availability of witnesses and counsel, as well as this Court's schedule. The first day of the hearing was held on February 17, 2012. The hearings then continued over six days in March and April, with the final day of hearing held on April 30, 2012. On November 5, 2012, the Court heard closing arguments from counsel for the Debtor, counsel for

Braun, counsel for the UST, and counsel for Ms. Stromberg.[29]  The Court then took the matter under advisement.

### III. CREDIBILITY OF WITNESSES

At the hearings on February 17, March 1, March 21, April 12, April 13, and April 30, 2012, the following witnesses testified: (1) Clarissa Waxton, a bankruptcy analyst for the office of the UST, who conducted the Debtor's initial debtor's conference (the IDC); (2) Patricia Alcaraz, an employee of the Firm at the time of the filing of the initial Schedules and the initial SOFA; (3) Benjamin Schlitt, a paralegal at the Firm who dealt with the Debtor on a few occasions; (4) Michael G. Orlando, a partner at the Firm who has previously represented the Debtor in various non-bankruptcy business matters, and who had knowledge of the Debtor's Chapter 11 case and Braun's involvement with it; (5) Barbara M. Rogers, the Debtor's current bankruptcy counsel; (6) Karl Stomberg, the Debtor in this case; (7) Syria Sinoski, a former intern at the firm of Rogers & Anderson; and (8) Calvin Braun, the Debtor's former counsel in this case and the subject of the Second Show Cause Order. After listening to the testimony, the Court makes the following observations and findings regarding the credibility of these witnesses.

### A.  Clarissa Waxton

Waxton testified that she conducted the Debtor's IDC on January 10, 2011. She testified that she did not remember the specific meeting. Her testimony is understandable considering the high volume of IDCs that she conducts in any given week and the lapse in time (over thirteen months) between her February 17, 2012 testimony in court and the Debtor's January 10, 2011 IDC. However, despite her inability to remember the specific conference with the Debtor, she

---

[29] The reason for the lapse of time between the conclusion of the hearings and closing argument is that the Court ordered transcripts of all of the hearings that took place concerning the Second Show Cause Order. The parties did not want to pay for transcripts, so the Court waited the requisite 90 days so that the parties could have free access to the transcripts on PACER, and thereafter have reasonable time to review the transcripts in order to prepare their closing arguments.

testified competently about her normal practices in the IDCs and her notes regarding the answers given at the Debtor's IDC.  Accordingly, the Court finds Waxton to be a credible witness and gives her testimony substantial weight.

### B.  Patricia Alcaraz

The Court finds that Alcaraz is not a credible witness.  During her testimony at the hearings, she answered questions defensively, gave answers that were contradictory, and had difficulty recalling facts, making this Court question her credibility.  For example:

1.  Alcaraz contradicted herself on the point of whether she placed the "wet signed" original Schedules and "wet signed" original SOFA in the file.  [Feb. 17, 2012 Tr. 109:9–25].  She first answered that she was not sure, that the file could have been misplaced, and that she was not sure if these documents were in the file; but, subsequently, she testified that she had a *specific* recollection of putting these documents into the file.  [Feb. 17, 2012 Tr. 109:9–25].

2.  During his testimony, Braun claimed that he saw the "wet signed" original Schedules and SOFA, and that they were signed in blue ink—a common practice at the Firm because it shows up better on copies.   [Apr. 30, 2012 Tr. 223:19–21].  However, in her testimony, Alcaraz stated that she provided the Debtor with a black pen, and that she watched the Debtor sign the Schedules and SOFA in black ink.  [Mar. 1, 2012 Tr. 38:16–20].  This conflicting testimony calls into question the credibility of both witnesses, as well as the notion that the documents were signed in the first place.

3.  Alcaraz also testified that, on January 6, 2011, in the Debtor's presence, she went through the Statements and the SOFA line by line with him [Feb. 17, 2012 Tr. 108:9–11], but then subsequently testified that the Debtor himself flipped through the Schedules and

SOFA for no more than five minutes while standing at her desk.  [Mar. 1, 2012 Tr. 26:21–25; 27:2–13].  If Alcaraz had actually reviewed the Schedules and SOFA line by line with the Debtor, the meeting would have lasted much longer than five minutes.

4.  Alcaraz testified that she kept logs of current and future tasks, but stated that she kept no timesheets and failed to record her time in any manner. [Feb. 17, 2012 Tr. 85:16–19; 91:21–24].  She claimed that she could not locate any of the logs [Feb. 17, 2012 Tr. 93:7–11], but subsequently stated that she was able to find a log that mentioned the Debtor but contained "nothing major" (i.e., was unrelated to the issues in the Second Show Cause Order).  [Feb. 17, 2012 Tr. 94:7–10].  She also later claimed that she had to turn in timesheets every week to the Firm's partners, which she failed to mention in her previous testimony regarding whether she kept logs and timesheets.  [Mar. 1, 2012 Tr. 43:21–22].

5.  She claimed that the Debtor was very cooperative with her, and that she had no problems obtaining information from him [Feb. 17, 2011 Tr. 106:16], which conflicts directly with Braun's time sheet entry on January 5, 2011 claiming that he spent 36 minutes discussing with Alcaraz the Debtor's "inability to provide basic information to complete the Schedules and Statements timely."[30]  [UST Ex. No. 8].

6.  The Court also finds it difficult to believe that Alcaraz could not remember the name of the law firm where she worked for nine months before starting at the Firm, which calls into question her ability to recall very specific details of her encounter with the Debtor on January 6, 2011.  [Mar. 1, 2012 Tr. 22:18–22].

---

[30] If there was enough information missing to warrant a 36 minute discussion on January 5, 2011, it seems unlikely that Alcaraz could have completed the Schedules and the SOFA for the Debtor to sign by the following morning. This lends further credence to the Court's finding that the Debtor did not sign the Schedules and SOFA on January 6, 2011 because they were not completed at that time.

In all, Alcarez testified for over two hours.  The Court carefully observed her and carefully listened to her answers.  Her demeanor was stilted; she appeared uncomfortable when asked questions that she interpreted to be a criticism of her own job performance; and she appeared from time to time to give definitive answers with much detail in order to justify her own competence.  Her recall of details from the meeting with the Debtor on January 6, 2011 is entirely suspect considering she could not even remember the name of the Firm where she worked prior to becoming Braun's legal assistant.  For all of the reasons set forth above, this Court finds Patricia Alcaraz not to be a credible witness.  The Court gives very little weight to her testimony.

### C.  Benjamin Schlitt

Benjamin Schlitt, a paralegal at the Firm, testified that on January 26, 2011, he emailed to the Debtor the original Schedules and the original SOFA that Braun had filed at 8:06 P.M. on January 7, 2011.  [Mar. 21, 2012 Tr. 17:12–18:9].  Schlitt also testified that he mistakenly gave the Debtor the original file rather than a copy of the file when the Debtor came to the Firm's office on March 22, 2011.  [Mar. 21, 2012 Tr. 20:10–15].  Schlitt himself had not gone through the original file and did not know whether any original documents with the Debtor's "wet signatures" were contained in the file that he gave to the Debtor on March 22, 2011.  [Mar. 21, 2012 Tr. 24:15–17].  The Court finds Benjamin Schlitt to be a credible witness, and gives his testimony considerable weight.

### D.  Michael G. Orlando

Mr. Orlando testified about many of his face-to-face and electronic communications with the Debtor, a phone call that took place between the Debtor and the partners of the Firm on the night of Braun's filing of the original Schedules and SOFA (i.e. on January 7, 2011), and

Braun's interactions with the Debtor.  While in the witness box, Mr. Orlando exhibited a clear bias against the Debtor, partially because Mr. Orlando faults the Debtor for convincing the Firm to represent Ms. Stomberg, which eventually led to the Firm having to return the fees that it collected from her.[31]  [Mar. 21. 2012 Tr. 89:23–90:5].  But, even more than this reason, Mr. Orlando believes that Braun has not only done nothing wrong, but has done everything right: "We did what we were supposed to do as a firm.  We put our reputation on this.  We have worked hard to get this reputation to a point of being excellent and I see somebody [i.e., Braun] that is a human being that cared enough to do the work being beat on unfairly and unjustly." [Mar. 21, 2012 Tr. 93:24–95:3].  Indeed, Mr. Orlando went even further by stating "I feel we're a victim in this matter . . . ."  [Mar. 21, 2012 Tr. 94:8].  The bias exhibited by Mr. Orlando undermines his credibility to a certain extent because in answering questions posed to him, he, whether consciously or not, was doing everything he could to cast Braun in a favorable light and the Debtor in an unfavorable light.

And, on certain specific points, Mr. Orlando's testimony is very questionable.  For example, his testimony regarding the Firm's possession of the "wet signed" Petition is contradictory with actual events.  Braun testified that he had in his possession the original Petition with the Debtor's "wet signature" which had been filed on December 23, 2010.  He, in fact, was able to produce this document at the October 18, 2011 meeting with the Debtor, [Apr. 30, 2012 Tr. 189:15–16].  Yet, both Braun and Mr. Orlando testified that the entire file *with "wet*

---

[31] This Court required the Firm to return the monies it had received from Ms. Stomberg after Braun failed to disclose his or the Firm's connection to Ms. Stomberg in the Application to Employ and in the Original Affidavit accompanying the Application to Employ, which led to the issuance of the First Show Cause Order.  [Finding of Fact No. 53].  The Court finds Mr. Orlando's hostility about the Firm taking on representation of Ms. Stomberg to be peculiar, if not downright misplaced.  The Debtor did not force the Firm to take on the representation of Ms. Stomberg.  The Firm itself made the decision to take on this representation.  Given that Ms. Stomberg was already divorced from the Debtor, and that the Debtor was obligated to make child support payments to her—thereby making her a creditor of the Debtor—the Firm should have thought twice about taking on representation of Ms. Stomberg if the Firm intended to continue to represent the Debtor, not only in his business dealings but in any bankruptcy.

signed" originals—including the Petition—was given to the Debtor at the Firm on March 22, 2011.  [Mar. 21, 2012 Tr. 20:9; 88:8–15]; [Apr. 30, 2012 Tr. 225:5–7; 221:4–14].  If Mr. Orlando's testimony is true, then the "wet signed" original Petition should not have been in Braun's possession as of October 12, 2011.  Because it was, Mr. Orlando's credibility on this point is significantly undermined.

In sum, under the circumstances described above, the Court gives Mr. Orlando's testimony some, but not substantial, weight.

### E.  Barbara Rogers

Barbara Rogers is the Debtor's current attorney in his existing Chapter 7 bankruptcy. She has kept excellent files in this case, has counseled the Debtor about submitting proper and complete amended Schedules, has received positive comments from the Debtor about the quality of her representation, and has generally performed all of the tasks that Braun should have performed when he was representing the Debtor and filing the original Schedules and the original SOFA.  Rogers gave testimony about the file that she received from the Firm, and the frustration and distress that Braun expressed to her when he could not locate in his office the original Schedules and the original SOFA with "wet signatures" of the Debtor.  [Finding of Fact No. 56]; [Apr. 12, 2012 Tr. 83:2–10].

In sum, Ms. Rogers was forthright and extremely knowledgeable in the testimony that she gave at the hearing. This Court finds her to be a very credible witness and gives her testimony substantial weight.

### F.  Karl Stomberg

Karl Stomberg, the Debtor in this case, was a somewhat credible witness.  However, there were several points on which the Court finds that the Debtor was not very credible, including the following:

1. He evaded many of the questions regarding whether he disclosed certain transfers, such as the 51% transfer of Southern Luxury Motors, LLC.  [Apr. 13, 2012 Tr. 79:8–21].

2. He was also evasive when asked about when he started operating out of Southern Luxury Motor Cars rather than out of Crave Luxury Auto, his former DBA ("doing business as") name.  Many of his answers were vague, and he claimed that he did not remember any details regarding when he was paid commissions, where they came from, or even how much the commissions were.  [Apr. 13, 2012 Tr. 84:9–25; 85:6–13].

3. The Debtor's memory was, at times, spotty to a significant degree.  He claimed at one point that he did not talk to Braun at all before the filing of his original Schedules and SOFA on January 7, 2011 [Dec. 1, 2011 Tr. 39:24–40:6]—but when confronted with phone records seeming to show otherwise, he could not "remember the conversation nor who was on the phone."  [Apr. 30, 2012 Tr. 50:1–2, 4–5; 62:13–19].  He repeated that phrase three to four times when asked details about the phone calls that took place the night of January 7, 2011.  [Apr. 30, 2012 Tr. 51:4, 13–14].

4. Regarding his visit to the Firm's office on January 6, 2011, the Debtor claimed that he could not remember going to the office, and did not remember ever meeting Alcaraz. [Apr. 30, 2012 Tr. 61:14–20].

5. The Debtor also claims not to remember any specific information about his IDC with Waxton [Apr. 30, 2012 Tr. 63:15; 64:8–12], and stated that it only lasted a very short time—about five minutes.  [Dec. 1, 2011 Tr. 58:16–17].  Waxton, however, testified that

she could not possibly have covered all of the material in five minutes and that the length of the meeting was closer to 45 minutes.  [Feb. 17, 2012 Tr. 43:22–44:4].  Nevertheless, the Debtor could remember that Braun assisted him in getting through the IDC and told him how to respond to questions when he was confused by them.  [Apr. 30, 2012 Tr. 64:18–25; 65:18–21].  However, Braun testified that he did not tell or even indicate to the Debtor how to respond to Waxton's questions.  [Apr. 30, 2012 Tr. 171:23–172:4].  Such inconsistencies certainly call into question the Debtor's credibility regarding his testimony about the IDC.

Overall, the Court finds that the Debtor generally: (1) has an extremely short attention span; (2) is disorganized; (3) is rushed; and (4) is inclined to hide any details about his businesses from his ex-wife (i.e., Ms. Stomberg)—with whom he had an extremely acrimonious custody dispute in family law court—out of concern that such disclosure will negatively affect his relationship with his present wife and his present mother in law (both of whom play some role in the Debtor's present business dealings).  *See, e.g.*, [Apr. 13, 2012 Tr. 95:17–21; 103:12–17].  These qualities have led the Debtor to be less than candid when testifying on some issues (noted above) in this Court.  Aside from these points, however, the Court finds the remainder of the Debtor's testimony to be fairly credible, and thus gives some weight to his testimony on these points.

### G.  Syria Sinoski

Syria Sinoski, an intern with Rogers & Anderson at the time that Rogers took on the Debtor's case, gave testimony on the discrete issue of what was in the file that the Debtor delivered to the law office of Rogers & Anderson on March 22, 2011 after picking it up from the

Firm. The Court finds Ms. Sinoski's testimony to be very credible, and accordingly, gives it substantial weight.

### H. Calvin Braun

The Court finds multiple inconsistencies in Braun's testimony, which are outlined below:

1. "It was imperative to me that these things be true and accurate." [Apr. 30, 2012 Tr. 163:12–14, 167:25, 168:1]. Braun gave this testimony to explain why he had three phone conversations with the Debtor on the evening of January 7, 2011. However, if it was really imperative that the Schedules and SOFA be true and accurate, Braun would have **personally** met with the Debtor at some point before January 7, 2011 instead of waiting until the day that the Schedules and SOFA were due to review these documents with the Debtor over the phone.[32]

2. Braun was evasive in answering whether Rogers actually asked for the "wet signed" original Schedules and "wet signed" original SOFA, and what his response to her inquiry was. [Apr. 30, 2012 Tr. 187:16–24; 229:7–14]. In fact, Braun testified both that Rogers did ask him for the signed Schedules and Statement of Financial Affairs, and that she did *not* ask him for these documents. [Apr. 30, 2012 Tr. 226:5–24, 228:9–13, 229:14]. Yet, Rogers was quite clear in her testimony that she explicitly asked Braun for both the "wet signed" original Schedules and the "wet signed" original SOFA during their face-to-face meeting on October 10 or 11 of 2011 [Apr. 13, 2012 Tr. 7:21–25], and during their phone conversation the following day. *See* [Apr. 13, 2012 Tr. 9:5–12]. The Court believes Rogers, and does not believe Braun because Rogers was responsive and forthright on the witness stand, and Braun was not; and, moreover, on being pressed during cross-

---

[32] "These things" refer to the Debtor's original Schedules and original SOFA.

examination, Braun conceded that Rogers had, indeed, asked him for these documents. [Apr. 30, 2012 Tr. 229:7–14]. Thus, after initially stating under oath that Rogers did not ask him for these documents, he later back off and conceded that she had. Braun lied under oath.[33]

3. Braun testified that he was not initially concerned with the fact that he could not locate the "wet signed" original Schedules and "wet signed" original SOFA in October of 2011. [Apr. 30, 2012 Tr. 230:16–19]. However, Rogers testified that during their phone conversation on October 12, 2011, Braun sounded very distressed by his inability to find these documents. [Apr. 12, 2012 Tr. 83:2–10]. In fact, when asked whether her impression was that Braun "was concerned about the fact that he was unable to locate the original signatures[,]" Rogers response was, "I would underline that [i.e., "concerned"] and put very, very in front of it." [Apr. 12, 2012 Tr. 84:3–7]. The Court finds that Braun lied. Contrary to what he stated under oath, he was very concerned, which is why he tried, on October 18, 2011, to persuade the Debtor to sign the original Schedules and original SOFA—which he had back-dated to January 7, 2011.

4. Braun testified that he did not conduct a search for the "wet signed" original Schedules and "wet signed" original SOFA, and did not conclude that these documents were missing at all until "late December of 2011." [Apr. 30, 2012 Tr. 227:10–18]. However,

---

[33] When asked on direct examination, "did Ms. Rogers talk to you about the fact that she did not have any of the signed Schedules or Statement of affairs?," Braun responded as follows: "That question was never raised as to—she never directly asked me, do you have the signed Schedules or do you have possession of those. She asked me to forward them once I found them or located them in the file because I had told her that I had put the file away and I really didn't want to get back involved in it again." [Apr. 30, 2012 Tr. 187:16–24]. But later, on cross examination, when Braun was asked "[d]idn't Ms. Rogers request it [i.e., the wet signed original Schedules and SOFA] during the course of that heated conversation on October 12th, 2011?," Braun initially responded that "[i]t was a very heated conversation and so I wasn't really sure what was requested and –" but then, when pressed by counsel for the UST with the question, "[d]idn't you testify earlier that Ms. Rogers asked you for the originally signed Schedules and Statement of Financial Affairs," Braun answered that "[s]he asked me if I had them, yes." [Apr. 30, 2012 Tr. 229:7–14].

in light of Rogers' request for the "wet signed" original Schedules and "wet signed" original SOFA on October 10 or 11, 2011 [Apr. 13, 2012 Tr. 7:21–25] and Rogers' testimony that Braun was "very, very" distressed by his inability to find the documents at that time [Apr. 12, 2012 Tr. 83:2–10], the Court does not believe Braun's testimony on this point.

Moreover, the Court does not believe Braun's testimony on this point considering his meeting with the Debtor at the Firm's office on October 18, 2011.  Braun claims to have requested that the Debtor come to the Firm's office to ratify the original Schedules and SOFA.  Braun testified that he did not ask the Debtor to sign the original Schedules and SOFA at this meeting, but rather asked the Debtor to meet with his counsel (i.e., Rogers) and determine if she believed that it was appropriate for the Debtor to sign these documents for ratification purposes.  [Apr. 30, 2012 Tr. 231:11–15, 232:14–19].  The Debtor's recollection about this meeting was entirely different.  The Debtor testified that Braun asked him (i.e., the Debtor) to sign the original Schedules and SOFA [Apr. 30, 2012 Tr.78:11–14], that he refused to sign without the advice and approval of Rogers, and that Braun became "extremely upset" over the Debtor's position.  [Apr. 30, 2012 Tr. 79:22–25].

If, as he testified, Braun did not check the files within the Firm until December of 2011 to determine if he had possession of the "wet signed" original Schedules and SOFA [Apr. 30, 2012 Tr. 227:10–18], and if, as he testified, he was not initially concerned over not having possession of the "wet signed" original Schedules and SOFA [Apr. 30, 2012 Tr. 230:16–19], then Braun would **not** have called the Debtor into his office on October 18, 2011 and asked him to sign the originally filed Schedules and SOFA (dated January

7, 2011); nor would Braun have become angry when the Debtor refused to sign these documents at this October 2011 meeting. [Apr. 30, 2012 Tr. 80:17–18].

The Court finds that, indeed and in fact, Braun was very much concerned in October of 2011 that he did not have the "wet signed" original Schedules and the "wet signed" original SOFA. He clearly looked for them in October of 2011 after his discussions with Rogers; he clearly did not find them; he clearly attempted to obtain the Debtor's signature in October when he could not find them; and, when he failed to do so, he clearly did not inform this Court that he was in violation of Bankruptcy Local Rules 1001-1 and 5005-1. Thus, Braun's credibility is severely undermined by his failure to disclose to this Court that he was in violation of these Local Rules and by his untruthful testimony that he was not initially concerned about not having possession of the "wet signed" original Schedules and SOFA. Indeed, when the Debtor refused to sign and departed the Firm's office on that day, Braun was so concerned that he informed Mr. Orlando about the Debtor's refusal to sign, which led Mr. Orlando to send a belligerent e-mail to the Debtor that read as follows: "We [the Firm] feel we are being treated like step-children . . . I forced Calvin to file for you and now we are concerned we are going to get screwed again, since you refused to sign the schedules." [UST Ex. No. 12]. Mr. Orlando's tone in this e-mail indicates that he too, was concerned at this point that the Firm did not have in its possession the "wet signed" original Schedules and the "wet signed" original SOFA; and because Mr. Orlando, by his own admission, is not a bankruptcy attorney, well-versed in the Local Rule requirement that a debtor's attorney is required to maintain possession of the "wet signed" SOFA and Schedules for five years, the only logical finding that this Court can make is that Braun informed Mr. Orlando

about this Rule and of the concern that Braun himself had over being in violation of this Rule.  Braun was unquestionably concerned as of October 18, 2011, and when he testified before this Court that he did not become concerned until December of 2011, he lied.  This testimony further erodes Braun's credibility.

5.  Braun claims to have asked Rogers, during his telephone conversation with her on October 12, 2011, whether she had "an issue" with him having the Debtor sign the original Schedules and original SOFA as a means of ratifying them.  [Apr. 30, 2012 Tr. 188:3–5].  Rogers, however, testified that she did not speak to Braun until *after* the Debtor delivered the original, unsigned Schedules and SOFA to her, which Braun had sought to have the Debtor sign.  [Apr. 12, 2012 Tr. 90:2–9].  The Court believes Rogers, who, aside from being truthful and trustworthy, has no motive to lie here; whereas Braun, on the other hand, has a reason to lie.  By testifying that he asked Rogers for her permission for him to meet with the Debtor to obtain the Debtor's signature, Braun wants this Court to believe that Rogers actually approved of what he attempted to do.  Moreover, by testifying that he first sought Rogers' permission, Braun wants this Court to believe that he did not violate the Texas Disciplinary Rules of Professional Conduct[34] by conferring directly with a person who is represented by another attorney.  The Court finds that Braun did, in fact, violate this rule because the Court believes Rogers and does

---

[34] The rule governing this professional duty is Rule 4.02, which is entitled "Communication with One Represented by Counsel."  This rule states that:

> (a) In representing a client, a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so; (b) In representing a client a lawyer shall not communicate or cause another to communicate about the subject of representation with a person or organization a lawyer knows to be employed or retained for the purpose of conferring with or advising another lawyer about the subject of the representation, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

not believe Braun.  That is, the Court finds that Braun, without Rogers' permission, did meet with the Debtor to try to obtain his signature, and that Rogers only learned of this meeting **after** the Debtor came to her office.  Braun's credibility is further undermined by these improper actions and his false testimony.

6. The fact that Braun had in his possession the original Petition with the Debtor's "wet signature" which had been filed on December 23, 2010, and was able to produce it at the October 18, 2011 meeting with the Debtor, [Apr. 30, 2012 Tr. 189:15–16] strikes the Court as odd because Braun and Orlando both testified that the entire file *with "wet signed" originals* was given to the Debtor when the Debtor came to the Firm and picked up the file from Schlitt on March 22, 2011.  [Mar. 21, 2012 Tr. 20:9; 88:8–15]; [Apr. 30, 2012 Tr. 225:5–7; 221:4–14].  If so, the "wet signed" original Petition should not have been in Braun's possession as of October 12, 2011.  Thus, both the credibility of Braun **and** Mr. Orlando is undermined.

7. Certain entries on Braun's timesheet are suspect.  For example, on January 6, 2011, Braun listed that for twelve minutes, he was "[a]dvised by staff that schedules for Stomberg are complete and client has reviewed and signed."  [UST Ex. No. 8].  Not only is this entry suspicious for its specificity, but also for the arbitrarily high amount of time listed for the activity.  It certainly does not take twelve minutes for Alcarez to inform Braun that the Debtor has reviewed and signed his Schedules.  Braun also evaded answering certain questions regarding why the timesheets took so long to be printed. [Apr. 30, 2012 Tr. 196:1–22].

8. Braun testified that he kept contemporaneous timesheets, but later admitted that he does not enter them into the system until up to a week after the event occurred.  [Apr. 30, 2012

Tr. 197:2–8].   A week later is not "contemporaneous."   Braun is familiar with the contemporaneous timesheet requirement, as this Court reduced his fee award after a similar incident in 2005 in which he failed to keep contemporaneous timesheets.   *See In re EBCO Land Dev., Ltd.*, Case No. 04-30519, Doc. No. 632 at 2 ("The Court has considered the testimony and the comments of the Trustee and his accountant, and finds that Braun has failed to satisfy certain basic requirements of any attorney representing the debtor in a Chapter 11 case.   Specifically, Braun has failed to maintain contemporaneous time sheets . . . .").

9. Braun initially stated that he spent "several hours on the phone with him [i.e., the Debtor]" on January 7 [Apr. 30, 2012 Tr. 209:4–5], but then stated "[i]t was about an hour."  [Apr. 30, 2012 Tr. 209:14–21].  Thus, Braun attempted to convince this Court that he spent substantially more time reviewing the Schedules and the SOFA on the phone with the Debtor than he actually did.

10. Referring to the changes made on January 7, 2011, Braun testified that "Schedule B was changed only."  [Apr. 30, 2012 Tr. 216:2].  At another point, Braun testified "I made some changes to Schedule B, that's all I did."  [Apr. 30, 2012 Tr. 262:18].  Yet, when this Court reviewed the Schedules with Braun, Schedule by Schedule, he also admitted to making changes to Schedule C, which was not signed by the Debtor.  [Apr. 30, 2012 Tr. 266:1–3, 266:12–23].   Thus, Braun sought to convince this Court that he only made changes to Schedule B; it was only after the Court inquired further that he admitted to changing Schedule C as well.   Braun behaved similarly in *EBCO Land Development*, where he misled the Court by remaining silent when another party represented that the debtor's tax return had been filed even though he (i.e., Braun) knew that it had not been

filed.  *In re EBCO Land Dev., Ltd.*, Case No. 04-30519, Doc. No. 635, p. 2.[35]  The Court

chided Braun for his "less than accurate representations," but "hope[d] that Braun

[would] learn from this experience . . . and *always* be completely honest with the Court."

*Id.* at 3.  Braun has clearly failed to heed this warning.

11.  Additionally, Braun testified that the changes he made to Schedules B and C on January

7, 2011 "were fairly de minimis in nature."  [Apr. 30, 2012 Tr. 212:10–13].  However,

Mr. Orlando testified that the Schedules contained "a lot of inaccuracies" [Apr. 12, 2012

Tr. 19:10–14] and Ms. Orlando was concerned enough about the Schedules to call the

Debtor on the phone on the evening of January 7, 2011, to verify the information listed in

the Schedules.  [Apr. 12, 2012 Tr. 34:17–20].  The testimony of Ms. Orlando and Mr.

Orlando more accurately explains why all three partners in the Firm participated in the

initial 45 minute phone call with the Debtor [Apr. 12, 2012 Tr. 28:12–13].  If the

Schedules needed only *de minimis* changes, it is very unlikely that all three of the Firm's

partners would have been involved in a 45 minute telephone conference with the Debtor,

or that Braun would have two subsequent telephone conferences for 8 minutes and 11

minutes, respectively, with the Debtor.  [Finding of Fact Nos. 27, 29 & 30].

12.  Braun was uncooperative and non-responsive in many respects to the UST's questions.

[Apr. 30, 2012 Tr. 218:11–14].  He was particularly evasive when answering questions

regarding how much help he gave to the Debtor in filling out the Schedules and SOFA

and in preparing for the IDC.  For example, when asked, "Did you do anything to help

---

[35] At the plan confirmation hearing in this particular Chapter 11 case, the Court directly asked whether the debtor had filed all of its tax returns.  When another party stated to the Court that the 2001 tax return had been filed, Braun remained silent even though he knew that, in fact, it had not been filed.  Based upon the information given to the Court, it confirmed the proposed plan.  The Court would not have confirmed the plan if it had known that the 2001 tax return had not been filed, which was actually the case at the time the Court asked the question.  *See* [Case No. 04-30519, Doc. No. 635].

Stomberg prepare for the initial Debtor's conference at the U.S. Trustee's office?" Braun dodged the question and responded that "Stomberg had already been through one with Stomper Automotive a year before . . . ." [Apr. 30, 2012 Tr. 218:4–9].[36]  As another example, when asked "Tell me, back on Exhibit 19 [i.e., the new client package], where you would put information about interest in incorporated and unincorporated businesses?" Braun gave the following non-response:  "Well, one of the questions that we asked from him and I believe that was indicated in the Schedules and in the emails that we sent from the seven days that we spent putting together his Schedules was the request of his tax returns . . . " [Apr. 30, 2012 Tr. 203:7–15].  These non-responsive answers are representative of many of Braun's dissembling answers throughout his testimony.

13. Braun contradicted himself when testifying about how many copies of the Debtor's bankruptcy file existed at the Firm.  At one point, he testified that he did not believe that the Debtor's original bankruptcy file was ever copied [Apr. 30, 2012 Tr. 221:20], yet almost immediately thereafter said that there were two "Redrope" bankruptcy files for the Debtor containing the same information.  [Apr. 30, 2012 Tr. 222:5–6].

14. During his testimony, Braun claimed that he saw the "wet signed" original Schedules and "wet signed" original SOFA, and that they were signed in blue ink; according to Braun, this was a common practice at the Firm because blue ink shows up better on copies. [Apr. 30, 2012 Tr. 223:19–21].  However, Alcaraz testified that she provided the Debtor with a black pen, and that she watched the Debtor sign the Schedules and SOFA in black ink.  [Mar. 1, 2012 Tr. 38:16–20].  This conflicting testimony calls into question the

---

[36] Braun's answer reflects his lack of diligence.  He apparently concluded—incorrectly, for sure—that because the Debtor, on behalf of Stomper Automotive, LLC, had signed the Schedules and SOFA in that entity's Chapter 11 case, the Debtor did not: (1) need any assistance in completing the Schedules and SOFA in his own Chapter 11 case; or (2) need to have a face-to-face meeting with Braun to review the necessity of ensuring that the Schedules and SOFA be completely accurate.

credibility of both witnesses, and also the notion that the Debtor ever signed these documents in the first place.

15. Braun claims to have had a conversation with Ms. Stomberg wherein he explained to her the potential conflicts that were involved in representing her in her Chapter 7 and the Debtor in his Chapter 11 simultaneously [Mar. 10, 2011 Tr. 27:12–28:2], yet somehow he failed to mention these same conflicts in his Original Affidavit attached to the Application to Employ, which he filed in the Debtor's case.  *See also* Footnote No. 1.

16. Braun told Ms. Stomberg on December 7, 2010 that he would file a motion to reopen her Chapter 7 case by the end of the week and accepted money to re-open her case; yet, he never did so.  [Mar. 10, 2011 Tr. 39:9–16].  Thus, Braun, an attorney and an officer of this Court, took money from an existing client and represented to her that he would take action on a matter that he knew was extremely important to her, but never followed through by taking this action.  Braun broke a promise he made to his client, and this conduct seriously undermines his credibility.

17. When he filed the Application to Employ, Braun also failed to disclose in the Original Affidavit that he had previously represented the Debtor's business (i.e., Stomper Automotive, LLC) in a Chapter 11, and that Ms. Orlando had represented the Debtor in his divorce from Ms. Stomberg. (See Amended Affidavit, Doc. No. 19 vs. Original Affidavit, Doc. No. 7-1).  Only when Ms. Stomberg subsequently discovered that Braun was seeking this Court's approval to represent her ex-husband in his Chapter 11 case and filed her Opposition Response on the grounds of conflict of interest did Braun attempt to cure his misrepresentations by filing the Amended Affidavit in which he admitted that he had, in fact, represented Ms. Stomberg in her Chapter 7 case.  [Doc. No. 58].  Even then,

in the Amended Affidavit, Braun still represented that he did not represent any creditors of the Debtor, which was untrue because he was counsel of record for Ms. Stomberg, who was a creditor in her ex-husband's Chapter 11 case.

Based on Braun's misrepresentations, inconsistent statements, and unwillingness to respond to simple and direct questions, the Court finds Braun's testimony to have very little credibility; therefore, the Court gives his testimony virtually no weight.

### IV. CONCLUSIONS OF LAW

#### A. Jurisdiction, Venue, and Constitutional Authority

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). This proceeding is core because the acts leading to the issuance of the Second Show Cause Order occurred in a matter central to the administration of the Debtor's bankruptcy case. Additionally, venue is proper pursuant to 28 U.S.C. § 1408(1).

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, this Court must also evaluate whether it has the constitutional authority to sign a final order regarding the show cause hearing. *Stern v. Marshall,* 131 S. Ct. 2594 (2011). In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the

counterclaim being adjudicated is based solely on state common law and does not affect the claims adjudication process. *Id.* at 2616.

The matter at bar is not a counterclaim of the Debtor's estate based solely on state law. Rather, this matter arises from this Court's issuance of the Second Show Cause Order in order to maintain the integrity of the bankruptcy process. This matter arises out of violations by Braun, an officer of this Court, of various Federal and Local Bankruptcy Rules—specifically Federal Bankruptcy Rules 9011(b) and 5005(a)(2), and Bankruptcy Local Rules 1001-1 and 5005-1. This Court has authority under Federal Bankruptcy Rule 9011(c) to issue sanctions for violations of Rule 9011(b), as well as under 11 U.S.C. § 105(a) and applicable case law to police the conduct of the attorneys who appear in this Court and to impose sanctions on those attorneys who misbehave. *Chambers v. NASCO*, 501 U.S. 32 (1991); *Knight v. Luedtke (In re Yorkshire, LLC)*, 540 F.3d 328, 332 (5th Cir. 2008). There is no state law involved in the matter before this Court. Rather, the matter before the Court solely involves bankruptcy law. For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order imposing sanctions on Braun.

### B.  Braun Violated Federal Bankruptcy Rule 9011(b)

Federal Rule of Bankruptcy Procedure 9011 has important implications for attorneys who present documents to a court. Specifically, Rule 9011(b) provides, in pertinent part:

> (b) Representations to the court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, — (1) it is not being presented for any improper purpose, . . . (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if

specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

Fed R. Bankr. P. 9011(b).

1. Braun violated Rule 9011(b)(3) by failing to obtain the Debtor's signature on the original Schedules and original SOFA, which would have served as the Debtor's verification of the accuracy of the contents of these documents.

Related to Rule 9011(b) is Rule 1008, which requires that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified . . . ." Fed. R. Bankr. P. 1008. In other words, debtors must sign the petition, Schedules, and SOFA as a means of not only authorizing the filing of these documents, but of verifying, under penalty of perjury, that they have reviewed the information contained therein and that it is true and correct to the best of their knowledge, information, and belief. *In re Phillips*, 317 B.R. 518, 523 (B.A.P. 8th Cir. 2004); *In re Wenk*, 296 B.R. 719, 727 (Bankr. E.D. Va. 2002). Rule 1008 is related to Rule 9011(b) because, by failing to obtain the debtor's verification as to the accuracy of the documents he files, an attorney falsely represents to the court that "the allegations and other factual contentions have evidentiary support." Fed R. Bankr. P. 9011(b)(3); *In re Josephson*, Case No. 04-60004-13, 2008 WL 113861, at *6 (Bankr. D. Mont. Jan. 9, 2008); *see also In re Phillips*, 317 B.R. at 524 ("[T]he petition [the attorney] filed did not have the debtor's original signature and therefore lacked a verification of the facts. With no verification, the factual contentions have no evidentiary support and thus the petition violates Rule 9011(b)(3).").

Here, **Braun** knowingly filed documents (i.e., the Debtor's original Schedules and original SOFA) for which he does not have—and never has had—the Debtor's "wet

signatures."[37]   [Finding of Fact Nos. 26 & 33].  Thus, the Debtor never verified the accuracy of

the information contained in the original Schedules and original SOFA.  And, even if the Debtor

had signed a prior draft of the Schedules and SOFA and then *authorized* Braun over the phone

on the evening of January 7, 2011 to make changes and file these documents, Braun still did not

obtain the Debtor's signature on the changes to Schedules B and C.  [Finding of Fact Nos. 29 &

33].  As the court in *Phillips* noted, "[t]he issue is not whether the debtor *authorized* the filing of

a petition, but whether she *signed* the petition that was filed," because the signature is not only

authorization to file, but verification that the information provided is correct.  *In re Phillips*, 317

B.R. at 523.

Further, this Court agrees with the court in *Phillips* that there are no circumstances that

would ever justify an attorney filing a petition, any of the Schedules, or the SOFA without first

obtaining the debtor's signature, "regardless of how urgent the need may appear to be."  *See In*

*re Phillips*, 317 B.R. at 521 (refusing to accept attorney's excuse that filing petition without first

obtaining the debtor's signature was necessary to prevent a foreclosure sale of the debtor's

home).  Therefore, it is immaterial whether the changes that Braun made to Schedules B and C

on the evening of January 7, 2011 were *de minimis*, or that the Debtor was unable to come into

the Firm's office at that time to sign off on the changes, or even that January 7, 2011 was the

deadline for filing the Schedules and SOFA.  These circumstances do not excuse Braun from

obtaining the Debtor's "wet signatures" on any changes that Braun made to the Schedules.

Without the Debtor's signature to verify that the information in the Schedules and SOFA was

---

[37] Braun's position is that the Debtor signed the original Schedules and original SOFA on January 6, 2011, that the changes which Braun made on the evening of January 7, 2011 to Schedules B and C were *de minimus* [Apr. 30, 2012 Tr. 166:17–22], and that therefore, he decided to file the Schedules and SOFA on January 7, 2011 without obtaining the Debtor's wet signatures again after making the changes.  [Apr. 30, 2012 Tr. 212:14–18].  However, for the reasons already set forth in Finding of Fact No. 26, the Court has already found that the Debtor never signed the original Schedules and original SOFA on January 6, 2011 or at any other time.

correct, "the factual contentions have no evidentiary support."  By filing the Schedules and SOFA on January 7, 2011 at 8:06 P.M. without the Debtor's signatures, Braun violated Rule 9011(b)(3).

        2.   Braun violated Rule 9011(b)(1) and (2) by forging the Debtor's electronic signature on the original Schedules and the original SOFA

Moreover, electronically filing a document that purports to have the debtor's signature but which was not, in fact, signed by the debtor, is no different than physically forging the debtor's signature on a paper document.  *In re Wenk*, 296 B.R. at 725.  Thus, multiple bankruptcy courts have found that "electronically filing a document bearing an electronic signature that was not actually or validly signed" constitutes a forgery amounting to a Rule 9011 violation.  *In re Phillips*, 317 B.R. at 523–24; *see also In re Flowers*, Case Nos. 12-40298-CEC, 12-40454-CEC, 12-40457-CEC, 12-40459-CEC, 2012 WL 987298, at *7 (Bankr. E.D.N.Y. Mar. 22, 2012) (finding that an attorney violated Rule 9011(b) by forging the electronic signature of debtors' counsel on bankruptcy petitions and other documents); *In re Phillips*, 317 B.R. at 523–24 (upholding sanctions award where counsel violated 9011(b) by forging debtor's electronic signature on bankruptcy petition); *In re Josephson*, Case No. 04-60004-13, 2008 WL 113861, at *7 (Bankr. D. Mont. Jan. 9, 2008) (granting trustee's request for sanctions where counsel violated 9011(b) by forging debtors' electronic signatures on addendum to Chapter 13 plan); *In re Alvarado*, 363 B.R. 484, 492 (Bankr. E.D. Va. 2007) (finding that sanctions were appropriate for attorney who forged debtor's electronic signature on a bankruptcy petition, thereby violating Rule 9011(b)); *In re Wenk*, 296 B.R. at 728 (finding that counsel who forged debtor's electronic signature on petition violated Rule 9011(b)).

Here, Braun electronically filed the Debtor's original Schedules and original SOFA, representing with a "/s/" that the Debtor had signed these documents when, in fact, he had not.

[Finding of Fact No. 32].  By filing the Debtor's original Schedules and original SOFA with forged electronic signatures, Braun violated Rule 9011(b) because he could not have believed that filing these documents with forged signatures was proper or warranted under existing law or a good faith argument to extend the law.  *See* Fed. R. Bankr. P. 9011(b)(1), (2).

  3. <u>Sanctions are appropriate under Rule 9011(c) for violations of Rule 9011(b)</u>

An attorney who has violated Rule 9011(b) may be sanctioned pursuant to Bankruptcy Rule 9011(c).  *In re Nair*, 202 F. App'x 765, 766 (5th Cir. 2006) (reviewing the bankruptcy court's imposition of sanctions under Rule 9011(c) for a 9011(b) violation and finding that the bankruptcy court did not abuse its discretion); *In re Flowers*, 2012 WL 987298, at *7.  Section (c) provides that "if, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subsection (b) or are responsible for the violation."  Fed. R. Bankr. P. 9011(c).  Any party may file a motion for sanctions under Rule 9011(c), or pursuant to Rule 9011(c)(1)(B) "on its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney . . . to show cause why it has not violated subdivision (b) with respect thereto."  Fed. R. Bankr. P. 9011(c)(1)(B).

In the case at bar, this Court, *sua sponte*, issued the Second Show Cause Order notifying Braun of the conduct charged against him.  *See* [Doc. No. 115].  Specifically, the Second Show Cause Order requires Braun to show cause why he should not be sanctioned for the following: (1) filing the Debtor's Chapter 11 Petition with an "/s/" next to the Debtor's name when in fact the Debtor had not signed the Petition; (2) filing the initial Schedules and initial SOFA under the same circumstances; (3) never obtaining the Debtor's signature on the Declaration for Electronic

Filing; (4) never tendering an executed Declaration for Electronic Filing to the Court; and (5) never meeting with the Debtor prior to filing the initial Schedules and SOFA to review with him the accuracy of the information contained therein.  [Finding of Fact No. 65]; [Doc. No. 115]. Braun was given ample opportunity to respond by adducing testimony and introducing exhibits in the hearings that were held on the Second Show Cause Order, as well as filing responses and briefs.  This Court has concluded that much of Braun's conduct, as described with specificity in the Second Show Cause Order, violated Rule 9011(b), and, as he had notice and ample opportunity to respond, sanctions are therefore appropriate under Rule 9011(c).  The form and extent of these sanctions will be discussed subsequently in a separate section of this Opinion.

### C. Braun Violated Federal Rule of Bankruptcy Procedure 5005(a)(2) and Applicable Local Rules for Electronically Filing Documents with the Court

Federal Rule of Bankruptcy Procedure 5005(a)(2) authorizes electronic filing and provides:

> A court may by local rule permit or require documents to be filed, signed, or verified by electronic means that are consistent with technical standards, if any, that the Judicial Conference of the United States establishes.  A local rule may require filing by electronic means only if reasonable exceptions are allowed.  A document filed by electronic means in compliance with a local rule constitutes a written paper for the purpose of applying these rules, the Federal Rules of Civil Procedure, and 107 of the Code.

Fed. R. Bankr. P. 5005(a)(2).

In the Southern District of Texas, the relevant Local Rules which implement electronic filing are 5005-1 and 1001-1.  Local Rule 5005-1 governs the "Filing of Papers" and states, in pertinent part:

> Except as expressly provided or unless permitted by the presiding Judge, the Court requires documents being filed to be submitted, signed or verified by electronic means that comply with the procedures established by the Court.

S.D. Tex. Local R. 5005-1(b).

Local Rule 1001-1 provides, "[i]n addition to these rules . . . the Administrative Procedures for CM/ECF . . . govern practice in the bankruptcy court.  S.D. Tex. Local R. 1001-1(b).  Thus, these Local Rules, taken together, require compliance with "procedures established by the Court"—specifically, "the Administrative Procedures for CM/ECF."  S.D. Tex. Local R. 5005-1(b) and 1001-1(b).

As the title suggests, the "Administrative Procedures for the Filing, Signing, and Verifying of Documents by Electronic Means in Texas Bankruptcy Courts" (the Administrative Procedures for Electronic Filing), which the Local Rules reference, control electronic filings in this Court.   Section III of the Administrative Procedures for Electronic Filing, entitled "Electronic Filing and Service of Documents," Part B, paragraph 1 spells out signature requirements.  This paragraph requires that "[a] document filed by electronic means shall either (1) contain a scanned image of any manual signature or an electronic signature affixed thereto; or (2) display an '/s/' with the name typed in the location at which the signature would otherwise appear . . . ."  With respect to this particular requirement, it is clear that Braun complied: the documents he filed electronically at 8:06 P.M. on January 7, 2011 did certainly contain an electronic signature "/s/" next to both his name as well as the Debtor's.  [Finding of Fact No. 32].[38]   However, Braun did not comply with Section III, Part B, paragraph 3 of the Administrative Procedures for Electronic Filing, which sets forth that:

> Within five (5) business days of the filing by electronic means of a bankruptcy petition, list, schedule, or statement that requires verification or an unsworn declaration under Fed. R. Bankr. P. 1008, the Electronic Filer shall tender to the Court in paper format the appropriate "Declaration for Electronic Filing," substantially conforming either to Exhibit 'B-1,' 'B-2,' or 'B-3,' which has been executed by any individual debtor or by the

---

[38] It has been the undersigned judge's experience that, on occasion, attorneys who electronically file documents fail to display the "/s/" typically because they are inexperienced in electronic filing themselves and they do not regularly practice in the Southern District of Texas.  These circumstances are clearly not present here, as Braun has substantial bankruptcy experience and has been practicing in the Southern District of Texas for many years.

> authorized representative of any corporate or partnership debtor.  Such Declaration shall
> be thereafter maintained by the Clerk of the Authorizing Court in paper format.

Braun never obtained the Debtor's signature on the Declaration for Electronic Filing, nor did he

tender this document to the Court.  [Finding of Fact No. 34].  Therefore, Braun failed to comply

with paragraph 3.

Further, Braun violated Section III, Part B, paragraph 4 of the Administrative Procedures

for Electronic Filing.   This paragraph, entitled "Retention of Documents with Third-Party

Signatures," sets forth that:

> Except as otherwise set forth in this Appendix, or as otherwise ordered by the
> Authorizing Court, documents which contain the original signature of any party other
> than the Electronic Filer, other than a Declaration for Electronic Filing as referenced
> above, shall be retained by the Electronic Filer for a period of not less than five (5) years
> after the case or adversary proceeding is closed, and, upon request, such original
> document must be provided to the Court or other parties for review.

Because Braun never obtained the Debtor's wet signature on the original Schedules and the

original SOFA that he filed electronically on January 7, 2011 [Finding of Fact Nos. 32 & 33], he

not only did not, but could not, comply with paragraph 4 of Part B.  And, even if Braun had

actually obtained the Debtor's "wet signatures" on these documents, he failed to comply with

paragraph 4 of Part B because: (1) he failed to retain them; (2) after Rodgers requested them, he

could not provide them to her; and (3) after this Court requested them, he could not produce

them.

Because Braun did not comply with paragraphs 3 and 4 of Section III, Part B of the

Administrative Procedures for Electronic Filing, Braun has never been in compliance with "the

Administrative Procedures for CM/ECF" and, in turn, has never been in compliance with the

"procedures established by the Court" for documents being filed by electronic means. S.D. Tex.

Local R. 1001-1(b) & 5005-1(b).  Thus, Braun has violated the specific Local Rules for the

Southern District of Texas, governing electronic filing of documents.  And, because he violated

the above-referenced Local Rules, Braun also violated Federal Rule of Bankruptcy Procedure 5005(a)(2), which requires that documents be filed in accordance with local rules.  Fed. R. Bankr. P. 5005(a)(2).

### D. Braun Violated the Local Rules of the United States District Court for the Southern District of Texas, Appendix D, Guidelines for Professional Conduct A, B, & D[39]

Practicing attorneys owe fundamental duties of professional responsibility to their clients, the judiciary, opposing counsel, and the administration of justice.  *See USDC/SDTX Local Rules (2000), Appendix D, Guidelines for Professional Conduct*.  These duties, which are articulated in the Guidelines for Professional Conduct, encompass three areas that are relevant to the circumstances at hand.  First, Provision A of the Guidelines requires that attorneys, in fulfilling their primary duties to their clients, remain conscious of the broader duties owed to the judicial system.  Provision B of the Guidelines provides that lawyers owe duties of candor and diligence, and utmost respect to the judiciary.  Finally, Provision D states that lawyers owe fundamental duties of personal dignity and professional integrity to the administration of justice.  Braun's conduct, including his failure to meet face-to-face with his client (i.e., the Debtor) to review the original Schedules and original SOFA [Finding of Fact No. 31], his filing of these documents on January 7, 2011 with forged electronic signatures [Finding of Fact Nos. 32 & 33], and his failure to disclose to this Court that he had not obtained and maintained possession of the Debtor's original "wet signatures", violated these professional standards.

1. <u>Braun's Violations of Provision A of the Guidelines for Professional Conduct</u>

---

[39] In 2007, the District Judges of the Southern District of Texas voted to adopt these Guidelines for Professional Conduct, to be observed by all attorneys appearing before any district judge, bankruptcy judge, or magistrate judge presiding in the Southern District of Texas.  *General Order 2001-7*. The guidelines are derived from the decision rendered in *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n*, 121 F.R.D. 284 (N.D. Tex. 1988).

The Local Rules for the Southern District of Texas, Appendix D, Provision A provide that "[i]n fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both the attorney and the client." Braun breached duties owed to his client (i.e., the Debtor) by failing to meet with the Debtor in person to review the original Schedules and the original SOFA with him prior to filing these documents,[40] and breached duties both to his client and to the judicial system when he allowed his legal assistant, Alcarez, to handle aspects of the Debtor's bankruptcy case in which he, as the Debtor's attorney, should have been personally involved.

The Debtor's Schedules and SOFA were, at least initially, filled out entirely by Braun's legal assistant, Alcarez, with information that she obtained from the Debtor via email. [Finding of Fact Nos. 18 & 27]; [Apr. 30, 2012 Tr. 247:19–25, 248:1–8, 273:4–6]. Alcarez had received no bankruptcy-related training and no training in BankruptcyPRO (i.e., the system used to complete the Debtor's original Schedules and original SOFA). [Mar. 1, 2012 Tr. 24:25–25:5]. In fact, Alcarez testified that she had received no formal training whatsoever at the Firm. [Mar. 1, 2012 Tr. 41:7–13]. She had, at best, done "a little bit of bankruptcy" at her first job as a legal assistant over 20 years prior. [Mar. 1, 2012 Tr. 24:16–24]. Alcarez's limited knowledge of bankruptcy is illustrated by the fact that she called Mr. Orlando over to her desk when the Debtor was in the Firm's office on January 6, 2011 to have Mr. Orlando indicate where the Debtor should sign the Schedules and SOFA.[41] [Feb. 17, 2012 Tr. 87:22–24]. And, not only was

---

[40] For a more detailed discussion of how Braun breached duties owed to the Debtor by failing to personally meet with him prior to filing the original Schedules and original SOFA, see Section E of this Memorandum Opinion.

[41] It should be noted that this Court has found that the Debtor did not actually sign the original Schedules and original SOFA at that time. *See* [Finding of Fact No. 26]. But, even assuming that the Debtor did sign the original Schedules and original SOFA on January 6, 2011, the documents that he signed were prepared by Alcarez, a person so unknowledgeable about bankruptcy that, by her own testimony, she had to ask Mr. Orlando to indicate where the Debtor needed to sign the Schedules and SOFA. This is why, among other reasons, Braun needed to meet personally with the Debtor.

Alcarez untrained, but she was apparently distracted—Alcarez testified that she was simultaneously working as a real estate agent and a massage therapist, and left the Firm just a few weeks after preparing the Debtor's Schedules and SOFA because she "was busy" and had "other stuff going on." [Feb. 17, 2012 Tr. 86:15–18].

Not only did Braun allow his untrained legal assistant to prepare the Debtor's Schedules and SOFA, but he also delegated to her the task of reviewing them with the Debtor and obtaining his signatures. Yet, Alcarez only met with the Debtor face-to-face on one occasion—January 6, 2011—when the Debtor came to the Firm's office [Feb. 17, 2012 Tr. 63:3–6], and Alcarez did not actually review the Schedules or SOFA in detail with the Debtor. [Finding of Fact No. 24]. Rather, the Debtor, while standing at Alcarez's desk, flipped through the Schedules and SOFA on his own for no more than five minutes. [Mar. 1, 2012 Tr. 27:2–13]. Further, Alcarez never mentioned to the Debtor that he was signing under oath subject to penalty of perjury. [Mar. 1, 2012 Tr. 35:15–17].[42]

Certainly, this Court recognizes that legal assistants frequently assist bankruptcy attorneys in collecting financial information from debtors, but there is a fundamental difference between a legal assistant and a bankruptcy attorney. Bankruptcy attorneys aid their clients by using their expertise in bankruptcy law to give legal advice. On the other hand, legal assistants are *not* attorneys. Legal assistants may not counsel, warn, or ensure the Debtor's compliance with bankruptcy law; rather, they are charged with mere transposition of the debtor's information onto the Schedules and SOFA.

---

[42] As already stated in the Credibility Section of this Opinion, the Court finds that Alcarez is not a very credible witness and gives very little weight to her testimony. However, her testimony that she never mentioned to the Debtor that he was signing the Schedules and the SOFA under oath subject to penalty of perjury is credible. Indeed, no one contradicted her testimony on this particular point; and given her lack of training, it makes sense that she made no such statement to the Debtor. *See also In re Tran*, 427 B.R. at 809 (criticizing attorney for failing "to instill in his own staff the importance of the schedules or the need for complete honesty and disclosure.").

Here, Braun appears to have frequently allowed Alcarez to perform these sorts of prohibited duties.  As Alcarez testified, she often reviewed the Schedules with other debtor-clients of the Firm:

> Court:  Did they (i.e., the debtors) ever ask you any questions [during these meetings]?
>
> Alcarez:  I'm sure they would have if they had a question.
>
> Court:  Can you give me an example of the type of question they would ask?
>
> Alcarez:  Probably, something like okay this was—this is really old do we really need to put this, or I remember one lady was like well that was my ex-husband's debt, why should I put it on mine or something like that.
>
> Court:  And would you try to respond?
>
> Alcarez:  If I don't know an answer, I always would say you know what, let me ask Calvin about this or I'll make a note of it so Calvin can check it or—
>
> Court:  And if you did know the answer, would you respond?
>
> **Alcarez:  If I do know the answer, I do respond.**

[Mar. 1, 2012 Tr. 34:14–35:6] (emphasis added).

This testimony tends to indicate that Alcarez—at Braun's direction—was improperly engaging in the practice of law by giving legal advice to debtors as they completed their Schedules.  It also reveals that the degree of Alcarez's involvement with the Debtor's case was far from unique—based on Alcarez's testimony, it seems that Braun often delegated these types of duties to her.  In the instant case, Braun referred to the Debtor as "difficult" and even "painful" to deal with [Apr. 30, 2012 Tr. 163:3–5, 210:21–25], and therefore seems to have passed much of the communication responsibilities off onto Alcarez.  As Braun stated, Alcarez

"dealt with it on a day-to-day basis, she was in the trenches with these people."[43]  [Apr. 30, 2012 Tr. 215:7–12].

This is not the first time that Braun has abdicated his responsibilities to a client.[44]  For example, in 2005, in *In re EBCO Land Development*, Case No. 04-30519, the undersigned judge admonished Braun for keeping "sloppy" time records.  [Tape Recording, 11/30/05 Hearing at 1:18:45-1:18:47 P.M.].  In a hearing on the matter, Braun indicated that his sloppiness was due to his "hatred of the case."  [*Id.* at 1:20:50-1:20:59 P.M.].  Yet, as this Court told Braun at the time, taking on a case requires a "100% effort."  [*Id.* at 1:22:00-1:22:20 P.M.]  After agreeing to represent the client, the attorney must "take the case seriously," and give more than a "half-baked" effort.  [*Id.*].

Nevertheless, in the case at bar—seven years after the admonishment in *EBCO Land Development*—Braun again seems to have removed himself from the bankruptcy process, giving the Debtor only the "half-baked" effort that this Court instructed not to do.  Braun did not initially collect the information for the Schedules and SOFA; he did not fill out the initial Schedules and SOFA; he did not review either the Schedules or the SOFA face-to-face with the Debtor; he did not ensure that the Debtor signed the Schedules and SOFA; and he did not emphasize to the Debtor the importance of his signature, which certifies *under oath* that the documents are complete and accurate to the best of the Debtor's knowledge.  And, not only did Braun fail to do these things, but he delegated these tasks to a non-lawyer.  In these ways, Braun

---

[43] It is disheartening for this Court to hear an attorney equate dealing with a client to "trench warfare."  The client is not the enemy.

[44] This is not even the first time that Braun has abdicated his responsibilities *in this case*.  Braun was Ms. Stomberg's attorney in her Chapter 7 case.  [Finding of Fact No. 9].  When *Mr.* Stomberg (i.e., the Debtor) subsequently decided to also file for bankruptcy, Braun essentially abandoned Ms. Stomberg.  Though he agreed to file the Certificate and accepted money from her, he thereafter failed to seek to re-open her Chapter 7 case, failed to file the Certificate, and even failed to return her increasingly urgent phone calls and e-mails.  [Finding of Fact Nos. 15 & 20].  She eventually learned the truth of Braun's desertion of her when she received a copy of the Application to Employ that Braun filed in the Debtor's case.  [Finding of Fact No. 39].

violated not only his professional responsibilities to the Debtor, but by ignoring clear instructions given in the past from this Court, failed to respect his broader duty owed to the judicial system.

2.      Braun's Violations of Provision B of the Guidelines for Professional Conduct

Provision B of the Guidelines provides that "[a] lawyer owes, to the judiciary, candor, diligence and utmost respect."  By falsely representing that the Debtor had signed the original Schedules and original SOFA by the time of filing on January 7, 2011 at 8:06 P.M., Braun showed that he was not diligent with his work, and was incredibly disrespectful of the judiciary and of the bankruptcy process.  Further, Braun violated his duty of candor by not informing the Court when he realized in October of 2011 that he did not have the "wet signatures" on the original Schedules and the original SOFA and that he was not able to obtain them from the Debtor.

As counsel for the Debtor, Braun is an officer of this Court and is bound by fiduciary standards.  *See ICM Notes, Ltd. v. Andrews & Kurth, LLP*, 278 B.R. 117, 123 (Bankr. S.D. Tex. 2002) (citing *Brown v. Gerdes*, 321 U.S. 178, 182 (1944)); *see also In re Alvarado*, 363 B.R. at 489–90 ("As officers of the court, attorneys have a special responsibility for upholding the quality of justice within the judicial process.").  Braun has repeatedly been warned by this Court of the need to communicate with forthrightness; for instance, in hearings related to *EBCO Land Development*, this Court specifically told Braun that he has a duty to inform the Court when things go wrong, *see* [Tape Recording, 11/30/2005 Hearing at 1:23:00-1:23:50 P.M.] and that it is "better to step up and alert [this Court] to all problems that have occurred."  [Tape Recording, 07/13/2006 Hearing at 9:03:00-9:03:32 A.M.].  Yet, here, rather than admit his mistake to the Court when he realized that he did not have possession of the wet signed original Schedules and "wet signed" original SOFA, Braun remained silent.  And, rather than come forward to the Court

60

when he learned that he would not be able to obtain a substitute signature from the Debtor in October of 2011, Braun stayed quiet.

To remain silent under the particular circumstances in this case, Braun showed an utter lack of candor and respect.  In fact, it was not until the Debtor testified in December, 2011 at the hearing on the **Order Requiring the Debtor to Appear and Respond to Allegations by Tammy Cromwell Stomberg that He is Knowingly Filing False and Material Declarations with this Court that the Court first learned that the Debtor had not signed the original Schedules and original SOFA**.  *See* [Finding of Fact No. 62].  And, Braun himself did not admit to not having the original signatures in his possession until this Court issued the Second Show Cause Order and called upon him to respond.  Thus, Braun's testimony on April 30, 2012 that he "was not trying to hide anything with the Court in anyway" was patently false.  [Apr. 30, 2012 Tr. 189:24–25]. Accordingly, Braun breached Provision B of the Guidelines by failing to treat the Court with candor and respect.

> 3.     Braun's Violations of Provision D of the Guidelines for Professional Conduct

Finally, Provision D of the Guidelines provides that "[a] lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity."  Dignity[45] and integrity[46] are broad ideals, but both reflect a seriousness and moral esteem that the attorney must show to his client, the judicial system, and other parties.  Braun breached Provision D in at least the following respects: (1) he filed the original Schedules and original SOFA without obtaining the Debtor's signatures and also without obtaining the Debtor's

---

[45] "Dignity:  the quality or state of being worthy, honored, or esteemed; formal reserve or seriousness of manner, appearance or language."  MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 323 (10th ed. 2001).

[46] "Integrity:  Firm adherence to a code of especially moral or artistic values:  Incorruptibility.  Synonym see Honest."  MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 607 (10th ed. 2001).

approval to electronically file these documents; (2) he forged the Debtor's signatures on the original Schedules and original SOFA; (3) he then attempted to cover up this forgery by personally meeting with the Debtor—without the consent of Rogers—and requesting him to sign the Schedules and SOFA more than nine months after Braun had filed them [Finding of Fact No. 57]; and (4) he evaded questions about his conduct, and when pressed, provided contradictory and self-serving answers under oath.  Each of these actions alone is cause for concern; taken together, they seriously undermine Braun's personal integrity and professional reputation.

### E.   Braun Failed to Personally Meet with the Debtor Before Filing the Schedules and the SOFA on January 7, 2011

Attorneys have "an affirmative duty to conduct a reasonable inquiry into the facts set forth in the Debtor's schedules [and] statement of financial affairs . . . before filing them." *In re Withrow*, 405 B.R. 505, 512 (B.A.P. 1st Cir. 2009).  As a part of this reasonable inquiry, the attorney should sit down in person with his client and carefully review the Schedules, the SOFA, and any other documents to be filed with the court to ensure that all of the representations set forth therein are true and accurate.  *In re Nguyen*, 447 B.R. 268, 282–83 (B.A.P. 9th Cir. 2011); *In re Tran*, 427 B.R. 805, 809–10 (Bankr. N.D. Cal. 2010);[47] *see also In re Daw*, 2011 WL 231362, at *6 n.14.

In the case at bar, Braun did not personally meet with the Debtor to review with him the accuracy of the information in the original Schedules and the original SOFA at any point prior to Braun's filing of these documents on January 7, 2011.  [Finding of Fact No. 31].  At most, he reviewed the Schedules and the SOFA with the Debtor on the phone mere hours before filing

---

[47] In *Nguyen,* the bankruptcy court found that the attorney's "cavalier attitude toward the schedules was contagious; it was transmitted first to [the attorney's] staff and then from them to the debtors themselves."  447 B.R. at 282–83. The Ninth Circuit Bankruptcy Appellate Panel agreed and stated, "we agree with the bankruptcy court that one hour is below the amount of time competent counsel generally spend with their clients.  [The attorney] has chosen to be an attorney and must accept the duties and responsibilities associated with the position."  *Id.*

them, and without ensuring that the Debtor himself had a copy of the Schedules and the SOFA in front of him to catch any inaccuracies while on the phone. [Finding of Fact No. 27]. Further, Braun made additional changes during and after his phone calls with the Debtor on the evening of January 7, 2011 [Finding of Fact No. 29]—changes that the Debtor never had the opportunity to see and approve. [Finding of Fact No. 33]. Braun attempts to justify his decision to file the Schedules on January 7 without first obtaining the Debtor's signature on the changes he made by stating that the Debtor was unable to come down to his office, that it was a unique situation, and that the changes were very minor in nature. [Apr. 30, 2012 Tr. 166:19–25, 261:6–7, 261:18–21]. Braun's excuse fails: regardless of the circumstances and whether the changes were substantial or not, **no** changes are to be made without the Debtor expressly signing off on them. Braun himself admitted that he knew this. Indeed, in response to the question whether it was his opinion that when Schedules are amended, they only need to be signed if major changes are made, Braun responded, "No." [Apr. 30, 2012 Tr. 260:22–25].

### F.   Summary of Braun's Violations Described in the Second Show Cause Order

The Second Show Cause Order identified five areas of concern:

(1) Did Braun electronically file the Chapter 11 Petition on December 23, 2010 showing an "/s/" next to the Debtor's name, thereby representing to this Court that the Debtor had actually signed the Chapter 11 Petition when, in fact, the Debtor had not signed this Petition?

(2) Did Braun electronically file the initial Schedules and the initial SOFA on January 7, 2011, showing the "/s/" next to the Debtor's name, thereby representing to this Court that the Debtor had actually signed these documents—which are signed under penalty of perjury by the Debtor—when, in fact, the Debtor had not signed these documents?

63

(3) Did Braun ever obtain the Debtor's signature on the Declaration for Electronic Filing?

(4) Did Braun ever tender to the Court the executed Declaration for Electronic Filing?

(5) Prior to filing the initial Schedules and the initial SOFA, did Braun ever personally meet with the Debtor to review the accuracy of the information contained within these documents?

Braun has met his burden of proof with respect to the first area of concern. The Court has found that the Debtor did, in fact, sign the Petition which Braun filed on December 23, 2010. [Finding of Fact No. 17]. Braun's use of the "/s/" on this document was, therefore, a truthful representation by Braun that the Debtor had actually signed the Petition.

Nevertheless, Braun has failed to meet his burden on each of the remaining concerns detailed in the Second Show Cause Order. Specifically, Braun has failed to prove that: (1) the Debtor actually signed the initial Schedules and the initial SOFA that Braun filed on January 7, 2011; (2) the Debtor signed the Declaration for Electronic Filing; (3) Braun tendered the Declaration for Electronic Filing to this Court; and (4) Braun personally met with the Debtor before filing the initial Schedules and the initial SOFA. Because Braun has failed to meet his burden with respect to these four areas of concern, this Court concludes that sanctions are appropriate.

### G.   Basis, Form and Extent of Sanctions to be Imposed Against Braun

1.   <u>Sanctions to be imposed under Rule 9011(c)</u>

Federal Rule of Bankruptcy Procedure 9011(c) provides specific authority for this Court to sanction attorneys for violations of Rule 9011(b). As discussed previously in Section B, subsection III, part IV, this Court has the authority to impose sanctions under 9011(c), as the

Debtor received notice (via the Second Show Cause Order) and had a reasonable opportunity to respond to the allegations against him.  Rule 9011(c) also gives this Court wide latitude in imposing sanctions, which may include both non-monetary and monetary sanctions. *In re Wenk,* 269 B.R. at 728; *see also In re Yorkshire, LLC*, 540 F.3d 328, 333 (5th Cir. 2008) (upholding the bankruptcy court's imposition of attorney's fees for a Rule 9011(c) violation); *In re TByrd Enterprises, L.L.C.* , No. 06–30078–H1–11, 2007 WL 4241705, at *7 (Bankr. S.D. Tex. 2007) (finding that "Rule 9011 sanctions may be imposed to deter conduct and may be payable to the Court.").[48]

### 2.  Sanctions to be imposed under § 105(a) and this Court's inherent powers

Additionally, this Court has the inherent power to sanction pursuant to § 105 of the Bankruptcy Code.  Under this section, the Court may issue any order that is "necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  Section 105 does not exist to merely punish behavior already sanctioned by other mechanisms.  Rather, § 105 is meant to "fill in the interstices" that rules such as 9011(c) do not fill.  *See Chambers*, 501 U.S. at 33, 46–47 ("[O]ther [sanction] mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions . . .  [W]hereas each of the other [sanction] mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. *At the very least, the inherent power must continue to exist to fill in the interstices*. Even Justice Kennedy's dissent so concedes.") (emphasis added)).

---

[48] There are certain situations where only non-monetary sanctions, and no monetary sanctions, can be imposed.  *See* Fed. R. Bankr. P. 9011(c)(2)(B) ("Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.").  These circumstances do not apply in the case at bar—namely, there was no voluntary settlement or dismissal of the claims against Braun; therefore, this Court may impose monetary sanctions.

The Fifth Circuit has also held that the imposition of sanctions using these inherent powers must be accompanied by a specific finding of bad faith. *Matter of Yorkshire, LLC*, 540 F.3d 328 (5th Cir. 2008); *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999); *In re Paige*, 365 B.R. 632, 638 (Bankr. N.D. Tex. 2007). In effect, to impose sanctions using its inherent powers, this Court must find that the "very temple of justice has been defiled" by the party's conduct. *Goldin*, 166 F.3d at 722; *Cadle Co. v. Brunswick Homes, LLC (In re Moore)*, 470 B.R. 414, 417, 436 (Bankr. N.D. Tex 2012).

In the case at bar, Braun's transgressions eclipsed 9011(b) and (c)'s narrow confines, resulting in violations of Federal Rule of Bankruptcy Procedure 5005(a)(2) (for improper electronic filing of the Debtor's original Schedules and original SOFA with the Court) and Local Rules 5005-1 and 1001-1 (for improper electronic filing of the Debtor's documents with the Court). The Court may therefore employ § 105 to sanction such misconduct. Further, it is clear that for the reasons stated above, Braun's actions have defiled the very temple of justice, and were in bad faith. <u>Indeed, if forgery by a seasoned attorney on his own client's Schedules and SOFA does not constitute bad faith, then nothing does</u>. Moreover, attempting to cover up this perfidy from this Court is no less bad faith conduct. Finally, failure to personally meet with one's own client to review the accuracy and importance of the Schedules and the SOFA is also bad faith. *See, e.g.*, *In re Nguyen*, 447 B.R. at 282 (upholding imposition of sanctions under 9011(c) and 105 that required attorney to physically meet with clients for at least one hour to ensure that assets and debts would be discovered and properly scheduled). Under all of these circumstances, the Court concludes that sanctions should be imposed against Braun.

    3. <u>The effect of Braun's past misconduct on the imposition of sanctions now to be imposed by this Court relating to the Second Show Cause Order</u>

In considering the sanctions to now impose on Braun, this Court must focus on how egregious his conduct has been in the specific areas set forth in the Second Show Cause Order. But, also relevant to this Court's determination of appropriate sanctions is the consideration of whether the conduct at issue was an isolated incident or part of a pattern of activity. *In re Allen*, Case No. 06-60121, 2007 Bankr. LEXIS 2063, at *7 (Bankr. S.D. Tex. June 18, 2007). This Court has already discussed its conclusions that Braun's conduct referenced in the Second Show Cause Order was in bad faith and defiled the very temple of justice. Therefore, the Court now focuses on Braun's past misconduct in this Court.

Although Braun has not been sanctioned in the past for the exact conduct set forth in the Second Show Cause Order—namely, failure to personally meet with his client before filing the Schedules and SOFA, failure to obtain his client's signature and authorization to file these documents on the client's behalf, and forging his client's name on the original Schedules and the original SOFA—Braun has previously been the subject of several show cause orders, and has also filed sloppy paperwork with the Court. [Tape Recording, 6/7/2011 Hearing at 10:51:47–10:53:37 A.M.].

Braun's conduct relating to the Second Show Cause Order and his conduct in the past, taken together, indicate that first, Braun has routinely engaged in improper behavior; that second, prior admonitions to Braun have failed to achieve the Court's objective, namely to deter Braun's poor conduct; and that finally, now, in the case at bar, severe sanctions are warranted.

### a.   *In re EBCO Land Development, Ltd.*

In 2005, the undersigned judge held a series of hearings after Braun submitted an application for compensation for services and reimbursement for expenses incurred on behalf his debtor client. *In re EBCO Land Dev., Ltd.,* Case No. 04-30519.   At the hearing held on

November 30, 2005, Braun testified that he failed to keep contemporaneous time sheets. [Tape Recording, 11/30/05 Hearing at 9:15:00–9:17:00 p.m.]. The Court found that the time sheets Braun did keep also failed to comply with U.S. Trustee guidelines, which specifically require simultaneous billing in one-tenth hour increments.[49] [*Id.* at 1:30:38–1:31:27 P.M.]. Braun, in some cases, billed in one-quarter hour increments. [*Id.*]. Additionally, testimony was adduced indicating that, contrary to the representations made at the confirmation hearing in the case, the debtor had not, in fact, filed its 2001 tax return. *See* [Case No. 04-30519, Doc. No. 635, p. 1]. This was extremely troublesome to the Court because Braun had stood silent at the confirmation hearing when another party stated that the debtor had filed the 2001 tax return *despite knowing this statement was false*.[50] [*Id.* at 1:18:00–1:20:40 P.M.]. As the Court stated in its order on Braun's application for compensation, "Braun led the Court to believe that the 2001 tax return had been filed when, in fact, it had not been filed." [Case No. 04-30519, Doc. No. 635, p. 2].

The Court rebuked Braun for his actions, making several findings at the November 30, 2005 hearing. The Court called Braun's work "very, very sloppy." [*Id.* at 1:18:00–1:19:00 P.M.]. Braun conceded that his work was careless, but said that his sloppiness was because he "hated this case" and that "it was a nightmare." [Tape Recording, 10/17/05 Hearing at 12:37:00–

---

[49]  United States Trustees will review applications for compensation and reimbursement of expenses under section 330 of the Bankruptcy Code, 11 U.S.C. 101, et seq. ("Code"), in accordance with procedural guidelines ("Guidelines") adopted by the Executive Office for United States Trustees ("Executive Office"). The following Guidelines have been adopted by the Executive Office and are to be uniformly applied by the United States Trustees . . . . The United States Trustees shall use these Guidelines in all cases commenced on or after October 22, 1994 . . . (b)(4)(v) Time entries should be kept *contemporaneously* with the services rendered in time periods of *tenths of an hour.*

Guidelines for Reviewing Applications for Compensation, 28 C.F.R. Part 58, Appendix (1996).

[50] The Court would not have confirmed the plan if it had known that the 2001 tax return had not yet been filed. The absence of the tax return led to some post-confirmation problems that were eventually resolved. Nevertheless, Braun knew that this issue was important, and he failed to be candid with the Court on this issue. Merely because the tax return issues were eventually resolved does not excuse Braun from his lack of candor.

12:38:00 P.M.].  The Court rejected this excuse, telling Braun that: (1) taking on a case requires

that an attorney give his full 100% effort to the case [Tape Recording, 11/30/05 Hearing at

1:20:30–1:22:15 P.M.]; (2) an attorney cannot give a "half-baked" effort [*Id.* at 1:22:15–1:25:00

P.M.]; and (3) Braun could not choose to "push these issues off onto somebody else."  [*Id.* at

1:22:15–1:25:00 P.M.].  The Court "[chose] to conclude" that Braun's mistakes were due to

sloppiness and *not* dishonesty, but insisted that Braun take his cases seriously.  [*Id.* at 1:24:30–

1:25:14 P.M.].

The Court also emphasized that Braun has a duty to inform the Court when things go

wrong in a case [*Id.* at 1:23:00–1:45:00 P.M.], and that Braun cannot remain silent.  *See* [*Id.* at

1:20:00–1:21:30 P.M.].  Indeed, this Court concluded in its order on Braun's application for

allowance of expenses that it "hopes Braun will learn from this experience that he needs to . . .

always be completely candid with the Court."  [Case No. 04-30519, Doc. No. 635, p. 3].

Braun's attorney promised the Court that "Braun will never—I can assure you . . . —will never,

if anything like this occurs again, will [never] *not* file a certificate or notice with the Court

advising that there had been an untruth or a misstatement of fact . . . [but] will immediately do

that in the future. Certainly, we have all learned from this case."  [Tape Recording, 11/30/05

Hearing at 12:36:00–12:38:00 P.M.].

### b.  *In re DKLC Group*

On March 19, 2010, the undersigned judge ordered Braun to show cause why he had not

filed an application to employ a real estate broker within the designated period.  *In re DKLC

Group*, Case No. 09-34833, Doc. No. 142; *see also* S.D. Tex. Bankr. Local R. 2014-1(b) (stating

that an application to employ a professional is deemed contemporaneous if filed within 30 days

of the commencement of the professional's provision of services).  At the hearing, Braun

claimed that he did not understand that this particular professional was integral to the estate, and therefore he did not realize that this professional was covered by the rule requiring applications to employ.  [Tape Recording, 3/19/10 Hearing at 2:58:00–3:10:00 P.M.].  The Court reluctantly accepted Braun's explanation, and took no action against him.  [*Id.*].   Nevertheless, the Court cautioned Braun that the safer course would have been to file an application regardless of his interpretation of the rule.  [*Id.*].

### c.  *In re Mo's BBQ*

Only a few weeks later, the undersigned judge ordered Braun to show cause for a second time.  *In re Mo's BBQ*, Case No. 09-35848, Doc. No. 76.  Braun had again failed to file an application to employ a professional—this time, his own firm—within the requisite time frame.[51] At the April 3, 2010 and June 29, 2010 show cause hearings, Braun admitted that the application was late.   [Tape Recording, 06/29/10 Hearing at 11:03:00–11:19:00 A.M.].   He also acknowledged that the undersigned judge had given Braun "great latitude in other issues."   [*Id.*]. Braun assured this Court that he was "trying to get back on the straight and narrow."  [*Id.*].

The undersigned judge told Braun at this hearing that he appreciated that Braun was taking responsibility for his inaction.  [*Id.*]   Despite initial concerns, *see* [Tape Recording 04/30/10 at 2:15:00–2:16:00 P.M.] (stating that the Court was "very concerned" about Braun's conduct), the undersigned judge decided to grant the application nunc pro tunc.  [Tape Recording, 06/29/10 Hearing at 11:03:00–11:19:00 A.M.].

### d.  *In re Milton Motors*

---

[51] Braun filed the debtor's Chapter 11 petition on August 7, 2009, but had not yet filed an application to employ his firm at the time this Court issued the show cause order on April 27, 2010.  Under Bankruptcy Local Rule 2014-1(b), Braun should have filed the application no later than 30 days after August 7, 2009, which means that he should have filed it by September 6, 2009.

In August of 2010, the Court had another reason to order Braun to show cause.  *In re*

*Milton Motors, Inc.*, Case No. 08-37549, Doc. No. 133.  In this case, Braun failed to file the

following documents within the deadline set forth in this Court's Order:  (1) "[a]ll applications

for administrative expenses and professional fees or a report indicating no such applications will

be filed"; (2) "[a] report covering the action taken by the Debtor and the progress made in

consummation of the plan"; (3) "[a]ny other adversary proceeding, contested matter, motion or

application or a report indicating no such matters will be filed"; and (4) "[a] post confirmation

certificate."  *Id.* at 1; *see also In re Milton Motors, Inc.*, Case No. 08-37549, Doc. No. 119.

Braun acknowledged that he had not timely filed these documents because he was overwhelmed

by his case load.  [Tape Recording, 09/03/10 Hearing at 11:24:19–11:29:39 A.M.].  He told the

Court that he was working with his firm to correct these mistakes, and admitted that he needed

help.  [*Id.*].

Yet, the Court "[had] heard many times that [Braun] is taking steps to fix these things."

[Id. at 11:26:55–11:27:48 A.M.].  And, as this was the third show cause hearing in 2010, the

Court finally asked Braun directly:  "Why are there so many problems?"  [*Id.*].  Braun assured

the Court that his firm was hiring an administrative assistant to help him, and that the firm was

instituting a monthly monitoring of his fees.  [*Id.* at 11:27:49–11:29:39 A.M.].  Braun agreed to

the Trustee's proposed remedy of a $5,000 reduction in his fees, and the Court accepted this

reduction for the delays within the case caused by Braun.  [*Id.* at 11:25:35–11:26:01 A.M.]; *see*

*also* Doc. No. 171.

### e.   Misconduct relating to the First Show Cause Order

Finally, the most recent examples of Braun's past misconduct have come in the pending

case.  On April 25, 2011, this Court issued the First Show Cause Order because in the

Application to Employ and in his Original Affidavit accompanying the Application, Braun had failed to disclose his or the Firm's connection to Ms. Stomberg. [Finding of Fact Nos. 37, 38 & 53]. In fact, Braun had affirmatively stated that neither he nor any of his partners "has represented and otherwise dealt with, or is now representing and otherwise dealing with, any entity that is or may consider itself a creditor . . . ." [Finding of Fact No. 38]; [Doc. No. 7-1, p. 3, ¶ 5]. Only when Ms. Stomberg subsequently discovered that Braun was seeking this Court's approval to represent her ex-husband—and, thus, objected to the Application to Employ on the grounds of conflict of interest [Finding of Fact No. 42]—did Braun attempt to cure his misrepresentations by filing the Amended Affidavit with the Court in which he admitted that he had, in fact, represented Ms. Stomberg. [Finding of Fact No. 45]. Even then, Braun still did not file an accurate affidavit because he was still counsel of record for Ms. Stomberg in her Chapter 7 case, and therefore he was representing a creditor of the Debtor. Specifically, Braun still represented in the Amended Affidavit that: (1) neither he nor the Firm "has represented and otherwise dealt with, or is now representing and otherwise dealing with, any entity that is or may consider itself a creditor . . . ."; (2) to the best of his knowledge, neither he nor any other member of his firm "represents or holds any interest adverse to the Debtor or its estate or have any interest materially adverse to the interest of any class of Debtor's creditors or equity security holders." [Finding of Fact No. 45]. Additionally, Braun failed to disclose in the Amended Affidavit that he had taken an additional $300 from Ms. Stomberg a mere 23 days before filing the Debtor's Petition, that he had promised Ms. Stomberg that he would seek to have her Chapter 7 case re-opened, and that he had failed to do so. [Finding of Fact No. 45].

At the June 7, 2011 hearing on the First Show Cause Order, Braun apologized to this Court for his lack of disclosure concerning Ms. Stomberg and this Court admonished Braun to

slow down and think about his actions.  [Finding of Fact No. 54]; [Tape Recording 06/07/11 Hearing at 2:38:25-2:41:06 P.M.].  Yet, a few months later, in October of 2011, when Braun— after being questioned by Rogers as to whether he had possession of the wet signed original Schedules and original SOFA, realized that he did not have possession of these documents [Finding of Fact No. 57]—clammed up.  Rather than affirmatively inform this Court that he did not have possession of these documents as required by the Administrative Procedures for Electronic Filing, Braun improperly tried to convince the Debtor to wet sign back-dated Schedules and SOFA.  [Finding of Fact No. 57].  And, when the Debtor refused to sign, Braun once again clammed up.  Rather than affirmatively inform the Court that he did not have possession of these wet signed documents, he remained silent, just as he did in *EBCO Land Development* on the tax return issue.  Thus, contrary to what Braun's attorney represented to this Court back in 2005—namely that Braun would never again fail to notify the Court of any untruths or misrepresentations of fact in a case—here Braun did just that.[52]  The Court only learned that Braun did not have possession of the wet signed original Schedules and original SOFA when the Debtor testified in December of 2011 that he had never signed the original Schedules and the original SOFA.

The above-described review of Braun's past misconduct in this Court from 2005 to the present reflects that he continues to practice law in a slipshod and unethical manner, and has clearly not learned from his past misconduct.  Indeed, given his conduct related to the First Show Cause Order and the Second Show Cause Order, he has become increasingly unethical.  His

---

[52] Specifically, in relation to the 2005 show cause order issued in *In re EBCO Land Dev., Ltd.*, Braun's attorney promised the Court that "Braun will never—I can assure you . . . —will never, if anything like this occurs again, will [never] *not* file a certificate or notice with the Court advising that there had been an untruth or a misstatement of fact . . . [but] will immediately do that in the future. Certainly, we have all learned from this case." [Tape Recording, 11/30/05 Hearing at 12:36:00–12:38:00 P.M.].

conduct has, in effect, gone from bad to <u>very bad</u>.  This Court has admonished Braun time and again to be more attentive to detail and to always be honest and forthcoming with the Court, and such blatant disregard for this Court's directions reflects Braun's inability to take instruction and related inability to follow the ethical and legal rules of the judicial system.  Under all of these circumstances, this Court concludes that serious sanctions are in order.

4.  <u>Monetary sanctions to be imposed against Braun</u>

In determining the appropriate sanctions to impose against Braun, the Court is mindful that the sanctions should be limited to what is sufficient to deter Braun from repeating such conduct and deter others from engaging in similar conduct in the future.  Fed. R. Bankr. P. 9011(c)(2); *In re Essien*, 358 B.R. 286, 289 (Bankr. S.D. Tex. 2006).  Some argument was made that this Court should impose only non-monetary sanctions against Braun.  The Court declines to take this route.  Braun is not a novice attorney; rather, as an attorney who has practiced for many years [Finding of Fact No. 1], Braun knows the necessary methods and procedures for the proper prosecution of a bankruptcy case.  This Court has, in fact, warned and provided the opportunity for Braun to improve his legal practice several times.  *See, e.g.*, *In re EBCO Land Dev., Ltd.*, Case No. 04-30519; *In re Mo's BBQ*, Case No. 09-35848; *In re Milton Motors,* Case No. 08-37549.  Indeed, Braun has conceded that this Court has been extremely flexible with him.  *See, e.g.*, [Tape Recording, 06/29/10 Hearing at 11:03:00-11:19:00 A.M.] (acknowledging that the undersigned judge had given him "great latitude in other issues" and assuring this Court that he was "trying to get back on the straight and narrow.").  Yet, this Court finds that little has improved; Braun is staunchly defiant in continuing to commit misdeeds.  <u>Indeed, he has resorted</u>

to forgery and perjury.  The Court believes that the most effective sanction is one that hits Braun

in the wallet.  As a result, the Court chooses to impose monetary sanctions.[53]

      "Bankruptcy courts have broad leeway in forming an appropriate sanction for unethical

behavior."  *In re Zuniga*, 332 B.R. 760, 788 (Bankr. S.D. Tex. 2005).  This Court has examined

the sanctions that have been imposed by other courts and notes that one means of determining

the amount of sanctions is to look to opposing counsel's attorney's fees.  *In re Yorkshire, LLC*,

540 F.3d at 333; *In re Essien*, 358 B.R. at 289; *see also* Fed. R. of Bankr. P. 9011(c)(2) (stating

that sanctions may include "an order directing payment . . . of some or all of the reasonable

attorneys' fees and other expenses incurred as a direct result of the violation.").  The Court

therefore concludes that Braun should be responsible for the following:

- The reasonable attorney's fees and costs incurred by Ms. Stomberg for having Mr. Burger represent her at all hearings related to the Second Show Cause Order.
- The reasonable attorney's fees and costs incurred by the UST for having Mr. Duran represent the UST at all hearings related to the Second Show Cause Order.
- The reasonable attorney's fees and costs incurred by Ms. Rogers for having Mr. Anderson represent her at all hearings related to the Second Show Cause Order.
- All reasonable amounts that Ms. Stomberg paid in connection with her attendance and participation at all of these hearings, with such costs to include parking fees and mileage.
- The reasonable fees and costs of Ms. Rogers for the lost time she spent testifying in this Court (regarding her representation of the Debtor and her

---

[53] This case is distinguishable from this Court's opinion in *In re Parsley*, in which this Court declined to impose sanctions on an attorney who filed a motion to lift stay based on an improper payment history and attempted to conceal this fact from the Court when he was later asked to explain his decision to withdraw the motion.  384 B.R. 138 (Bankr. S.D. Tex. 2008).  Important to the Court's decision not to impose sanctions in *Parsley* was the fact that the attorney had been fired with prejudice from his firm and was unemployed at the time of the show cause hearing. *Id.* at 182.  Here, Braun continues to be employed by the Firm and currently engages in the practice of law.  Indeed, Braun has recently filed a spate of Chapter 11s where he is counsel of record.  *See* Case Nos. 12-39248, 12-39247, 12-39246, 12-39245, 12-39244, 12-37419, & 12-37152.  Although 2016 disclosure of compensation statements have not yet been filed in four of these cases, the one that Braun filed in Case No. 12-37152 reveals that Braun collected a retainer of $9,200.  *See* [Doc. No. 12, p. 24].  The purpose of citing this figure is to demonstrate that Braun continues to earn a living prosecuting Chapter 11s.  Indeed, as this Court has noted in the past, one of Braun's strengths is his ability to generate Chapter 11 business for the Firm.

communications with Braun) that she could have otherwise devoted to rendering services to other clients and billing them for those services.

However, requiring the respondent (here, Braun) to pay the fees and costs incurred by others is not always the only proper measure of the amount that is appropriate to deter future wrongful conduct by a party and deter others from repeating such conduct. *In re TAGT, L.P.*, 393 B.R. 143, 154 (Bankr. S.D. Tex. 2006) (citing *Fox v. Acadia State Bank*, 937 F.2d 1566, 1571 (11th Cir. 1991)); *In re Essien*, 358 B.R. at 289 (same).  The Court can also require Braun to pay appropriate sums to the Clerk of Court.  Given the egregiousness of his conduct in the case at bar, this Court concludes that Braun should pay the following sums to the Clerk of Court:[54]

- $500 for Braun's violation of Federal Rule of Bankruptcy Procedure 9011(b)(3) for failing to obtain the Debtor's wet signature on the original Schedules.
- $500 for Braun's violation of Federal Rule of Bankruptcy Procedure 9011(b)(3) for failing to obtain the Debtor's wet signature on his original SOFA.
- $500 for Braun's violation of Federal Rule of Bankruptcy Procedure 9011(b)(1) and (2) for forging the Debtor's electronic signature on the original Schedules and SOFA.
- $500 for Braun's violation of Federal Rule of Bankruptcy Procedure 5005(a)(2) for improper electronic filing of the Debtor's original Schedules and original SOFA with the Court.
- $500 for Braun's violation of Local Rules 5005-1 and 1001-1 for improper electronic filing of the Debtor's original Schedules and original SOFA with the Court.
- $500 for Braun's violation of the Local Rules of the United States District Court for the Southern District of Texas, Appendix D, Guidelines for Professional Conduct Provision A.
- $500 for Braun's violation of the Local Rules of the United States District Court for the Southern District of Texas, Appendix D, Guidelines for Professional Conduct Provision B.

---

[54] These amounts are properly payable via a cashier's check made payable to the Clerk of Court, as the purpose of requiring payments of these additional amounts is to deter future similar behavior rather than to compensate any private party.  *In re TAGT, L.P.*, 393 B.R. at 156.

- $500 for Braun's violation of the Local Rules of the United States District Court for the Southern District of Texas, Appendix D, Guidelines for Professional Conduct Provision D.

## V. CONCLUSION

For several months, Braun has been in and out of this Court in connection with the Debtor's and Ms. Stomberg's bankruptcy cases. In an attempt to complete large amounts of case work in little time, Braun has exhibited reckless disregard for his duties as an attorney at law—breaking promises to his client (i.e., Ms. Stomberg), filing materially inaccurate affidavits, failing to disclose conflicts of interest, failing to meet with the Debtor in person to review his Schedules and SOFA prior to filing them, filing Schedules and a SOFA that were filled with some material inaccuracies, filing documents with forged electronic signatures of the Debtor in violation of the Federal Rules of Bankruptcy Procedure, the Local Rules for the Southern District of Texas, and the Bankruptcy Local Rules for the Southern District of Texas, and attempting to cover his tracks in every respect.  Each of these actions alone is an egregious affront to the dignity of this Court in particular and to the judicial system in general.  Collectively, they are a full-scale attack.

Abraham Lincoln once said, "[y]ou cannot escape the responsibility of tomorrow by evading it today."[55]  Braun has attempted to do this time and again with this Court; this conduct must now stop.  To allow such conduct to go unanswered would be as flagrant of a violation of this Court's duty as Braun committed in his duties to the Debtor, Ms. Stomberg, and the judicial system.  In 2010, Braun told this Court that he would "straighten up"—and this Court believed him.  [Tape Recording, 09/03/10 Hearing at 11:24:19–11:29:39 A.M.].  This, he has not done.  Rather than straighten up, he has zigzagged in his efforts to dodge his responsibility to clients

---

[55] WISE WORDS AND QUOTES 230 (Vernon McLellan ed. 2000).

and the judicial system, and has also twisted the truth in both his pleadings and his testimony. Rather than straighten up, Braun has covered up.

By imposing sanctions, this Court hopes that Braun will finally learn the lessons of the need to be truthful, candid, diligent, attentive to detail, and respectful of both this Court and the entire judicial system—lessons that he claimed to have learned at the close of the hearing on the First Show Cause Order in this case, but which his silence about never procuring and maintaining possession of the Debtor's wet signatures proves otherwise.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed:  January 10, 2013

_____
            Jeff Bohm
Chief United States Bankruptcy Judge

78